# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KEVIN RENDON, a/k/a Lina, a/k/a linalil,

*Defendant-Appellant.*

No. 09-4687

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Liam O'Grady, District Judge.
(1:08-cr-00504-LO-1)

Argued: March 24, 2010

Decided: June 17, 2010

Before NIEMEYER and MOTZ, Circuit Judges, and
James A. BEATY, Jr., Chief United States District Judge
for the Middle District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge Motz and Judge Beaty joined.

**COUNSEL**

**ARGUED**: William Todd Watson, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Alexandria, Virginia, for
Appellant. Andrew McCormack, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appel-
lee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public
Defender, Caroline S. Platt, Research and Writing Attorney,
OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexan-
dria, Virginia, for Appellant. Neil H. MacBride, United States
Attorney, Jay V. Prabhu, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexan-
dria, Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this appeal, Kevin Rendon challenges, as unconstitu-
tional, a search of his Microsoft Zune MP3 player conducted
by the military while he was a private in the U.S. Army,
which led to his conviction in civilian court for possession of
child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)
and 2256(8)(A).

While in the Army, Rendon's MP3 player was examined
pursuant to the standard intake procedure of the unit to which
he had been transferred, and child pornography was discov-
ered on the player. Based on that evidence and Rendon's sub-
sequent statement to military officers that there was a "high"
likelihood that child pornography would be discovered on his
computers at his residence—his mother's house in Lorton,
Virginia—a state search warrant issued at the request of the
Fairfax County Police Department to search the residence.
The search of the computers produced thousands of images
containing child pornography.

After Rendon was indicted for possession of child pornography, he filed a motion to suppress both his statement and the images discovered on his home computers as the fruit of an unconstitutional search of his MP3 player. The district court denied Rendon's motion, holding, among other things, that the search of the MP3 player was legally conducted as part of a valid military inspection and therefore did not violate Rendon's Fourth Amendment rights. Rendon thereafter pleaded guilty, reserving the right to appeal the district court's ruling on his motion to suppress, under Federal Rule of Criminal Procedure 11(a)(2), and the district court sentenced Rendon to 97 months' imprisonment.

In this appeal, we conclude that in the circumstances of this case Rendon did not have a reasonable expectation of privacy in the contents of his MP3 player that was violated and that therefore the state search warrant was not the fruit of an illegal search. Accordingly, we affirm.

I

On March 31, 2008, Private Kevin Rendon, a soldier in the U.S. Army, was transferred from the "D Trp, 5th Squadron, 15th Cavalry, 194th Armored Brigade" at the Army base in Fort Knox, Kentucky, to the "HHC, 46th Adjutant General Battalion, 194th Armored Brigade," also at Fort Knox. The HHC, 46th Adjutant General Battalion was an "out-processing unit" for soldiers who were being discharged from the Army, and Rendon was transferred to the unit to be discharged from the Army for medical reasons, having been diagnosed with Crohn's disease.

Upon arrival at his new unit, Rendon was counseled on the unit's rules and regulations, and he signed a statement indicating that he would abide by them or be subject to discipline under the Uniform Code of Military Justice. In addition, all of Rendon's personal property was inspected and inventoried pursuant to the unit's regularly performed intake protocol.

The protocol was spelled out in the "Drill Sergeant Continuity Book" (the "DSCB Handbook") that was applicable to the unit. The DSCB Handbook provided in part:

> Upon arrival to HHC all Soldiers must first report to the processing room. Soldiers are accepted between the hours of 0830 and 1500, Monday through Friday to include training holidays. Enclosed is a checklist to assist if necessary.
>
> Once complete with the processing room the new Soldier will move to the game room for further in-processing. The soldier will strip down into PT's to ensure that he does not have any contraband. He will separate all of his belongings into three sections; civilian and personal property, military clothing needed while here in HHC, and military clothing to be stored in the supply room. *As the [Drill Sergeant] it is your responsibility to ensure that the new Soldier receives a reception and integration counseling, has his belongings inventoried, i.e. cell phones/ipods are turned on and checked to ensure that the[re] are no graphic materials on them such as pornography.* The soldiers are issued linen and the following paperwork is properly completed: Personal Data Sheet, DA 4856, DA 3076, DA 2062, Personal Inventory, and DA 4986. The Soldier's medicine must also be collected, inventoried, and logged into the medication locker in the CQ office. If the supply technician is not available the items that are to be stored in the supply must be temporarily stored until the supply technician is available. During this process the Platoon Guide/Assistant Platoon Guide may be utilized as an assistant. Once the Soldier is completely in-processed arrangements must be made for him to receive a brief from the first sergeant.

J.A. 47 (emphasis added). Staff Sergeant Luis Quintana, a drill sergeant who was responsible for the inspection of Rendon's property, described the intake protocol for new soldiers:

> When a soldier arrives, they go through [the unit's] processing NCO, they make sure the paperwork is correct. And then they are moved over to a game room and they dump all of their equipment. All of their civilian equipment is inventoried, [and] their military equipment is inventoried.
>
> If they have any kind of contraband, any type of electrical equipment, anything like that, it's all collected up, it is confiscated for the time that they are in the unit until the time that they leave the unit, and then everything is given back to them.
>
> * * *
>
> When we take electronic equipment, what happens with it is we put it in a log, we mark it down with serial numbers, model numbers, and we lock it in a wall locker. And we ensure that it is tagged with their name, put in the bins, we lock the wall locker, and then we lock the door that the wall locker is in.
>
> * * *
>
> *And if there is a device, such as cell phones, MP3 players, iPods or anything like that that have downloadable images, we have to screen them for gang-related activity type paraphernalia. Any, what is it called, extremist organization stuff. Any type of pornographic material.* Because any of that stuff cannot be spread throughout the barracks and is not in good standing with the military, and we have to report that to our senior personnel.

J.A. 65-67 (emphasis added).

In accordance with these procedures, Rendon's Microsoft Zune MP3 player was inspected to determine if it contained any prohibited materials. When Sergeant Quintana turned on Rendon's MP3 player, he saw what looked to him to be "some sort of child pornography." He stated that he saw images of young girls "posing in provocative ways." In "[s]ome of the pictures the girls were touching themselves; some of the young girls were showing their private body parts. . . . One was of her top, but she was covering it with her hand and another was one with a bathing suit, but she was pulling [it] off to her side exposing [her] vagina." Sergeant Quintana estimated that the girls in the pictures were between 7 and 18 years old.

After observing these images, Quintana brought them to the attention of officers higher in the chain of command, including Captain Eric Horton, the unit's commanding officer. After reviewing the images himself, Captain Horton called the Army Criminal Investigation Division ("CID") for guidance. The CID told Horton "to go through all the pictures to see if there [were] any pictures of girls that were naked." After Captain Horton determined that there were in fact images of naked children, he directed Sergeant Quintana to take Rendon to the CID.

Rendon, while being questioned by the CID, consented to a search of his MP3 player that uncovered hundreds of images of young girls posing in sexually provocative positions. Rendon also gave the CID a sworn statement that there was a "high" likelihood that child pornography would be found on his home computers. Special Agent Bradley Stoffer of the CID then notified the Fairfax County (Virginia) Police Department of what had been uncovered. The police obtained a search warrant for Rendon's residence in Lorton, Virginia, and, in executing the warrant, uncovered thousands of images and videos of child pornography, including some in which

children—boys and girls—were depicted engaging in explicit sexual acts with adult males.

After Rendon was indicted by a federal grand jury for possession of child pornography, he filed a motion to suppress his statement and the evidence seized from his residence, contending that they were the products of an illegal search of his MP3 player by the military. The district court denied the motion, holding that "Rendon had no reasonable expectation of privacy in the contents of the MP-3 player that the military inspected when he arrived at the base." The court found that the inspection of the MP3 player was conducted "for a military—not law enforcement—purpose" dictated by the military's need "'for good order and discipline in the armed forces.'" (Quoting *Henson v. United States*, 27 Fed. Cl. 581, 593 (1993)). The court also found that the inspection of Rendon's MP3 player was "in accordance with pre-existing, written authorization from the unit command. Both the [DSCB Handbook] and directives from Captain Horton provided sufficient particulars as to the purpose and scope of the inspection," and "[a]t no point did the drill sergeants or Captain Horton exceed the parameters of the inspection." Explaining further the reasonableness of the protocol, the district court stated:

> [B]ecause of the unique demands of military life, soldiers on military bases have diminished privacy expectations. This is particularly true when a soldier is *entering* a military base. The Court of Military Appeals has observed that an entry gate at a base is the functional equivalent of a border for Fourth Amendment purposes. In some ways, the inspection of a soldier's possessions when he arrives on a base is not unlike a border search. The Fourth Circuit has observed that "extensive searches at the border are permitted, even if the same search elsewhere would not be." "'The government's interest in preventing the entry of unwanted persons and effects is at its

zenith at the international border.'" Similarly, the military has an interest in preventing the entry of contraband material onto bases and into barracks. At entry points to military installations, more intrusive inspection procedures are warranted because the base command must be able to control its borders and prevent contraband from being imported. For this to be effective, the military must be able to inspect items that may contain contraband before soldiers enter the barracks.

J.A. 179-80 (citations and footnote omitted) (quoting *United States v. Ickes*, 393 F.3d 501, 502, 505 (4th Cir. 2005) (quoting *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004))).

Following the district court's denial of his motion to suppress, Rendon entered a conditional guilty plea under Federal Rule of Criminal Procedure 11(a)(2) and was sentenced to 97 months' imprisonment, to be followed by 30 years of supervised release. From the district court's judgment, Rendon filed this appeal, challenging the district court's ruling on his motion to suppress.

## II

Challenging the Army's military authority to search and the district court's factual findings, Rendon contends that the district court erred in holding that the examination of his MP3 player was "a valid military inspection conducted for a military—not law enforcement—purpose" and therefore did not violate his Fourth Amendment right to be free from unreasonable searches. He argues that the search was not conducted as part of a valid military inspection, as defined in Military Rule of Evidence 313(b), because it was conducted primarily for law-enforcement purposes and was not justified by military necessity. More specifically, Rendon argues that the search could not have been part of a valid military inspection

because "[t]he only logical purpose to searching for gang-materials, pornography, or extremist materials on a device that has already been confiscated from a servicemember for the remainder of his time in the military is to subject the servicemember to some form of discipline," which, according to Rendon, is solely a law-enforcement purpose. In making this argument, Rendon focuses on the facts (1) that the officers conducting the search considered themselves to be conducting an "inventory" rather than an "inspection"; (2) that his MP3 player had already been confiscated when the search was conducted; and (3) that individualized suspicion of Rendon already existed when Sergeant Quintana's superior officers examined the MP3 player after Quintana's discovery of the images. At bottom, Rendon contends that the illegal military search poisoned the search warrant that issued from civilian authority, rendering it unreasonable and in violation of the Fourth Amendment.

At the outset, we address the facts, which show without contradiction that Rendon's MP3 player was temporarily confiscated and inspected as part of the protocol established in the DSCB Handbook. The record contains no evidence that, before the inspection, anyone held a particularized suspicion that Rendon was violating any law or regulation or that Rendon was being treated any differently from any other soldier entering the unit. The initial inspection of the MP3 player was conducted pursuant to a regularly scheduled intake protocol for new members of the unit, and the search stayed within the parameters authorized by the DSCB Handbook. The record also shows that Sergeant Quintana, carrying out the intake protocol, was the first person to inspect the MP3 player and observe the child pornography on it. Upon Quintana's observation, circumstances obviously changed significantly, and the Army then had a reasonable suspicion, indeed probable cause to believe, that a crime had been committed. Upon uncovering child pornography, Sergeant Quintana sought advice in his chain of command about what to do, and the question was ultimately referred to the commanding officer,

who referred the matter to CID and ultimately to civilian authorities. Inasmuch as the district court relied on these facts, it did not clearly err.

Rendon's legal arguments focus on (1) the purported lack of military necessity initially to conduct the search as part of an inspection and (2) the purported lack of authority of superior officers to look at the contraband once it had been discovered by Sergeant Quintana. In making the latter argument, Rendon distinguishes between the search conducted by Sergeant Quintana, who discovered the child pornography, and the searches conducted by his superior officers, including Captain Horton, who reviewed Rendon's MP3 player for the contraband described to them by Sergeant Quintana. Rendon argues that the examination by Captain Horton was a search conducted on the basis of an individualized suspicion and therefore was not an inspection justified by Military Rule of Evidence 313. *See* Mil. R. Evid. 313(b).

The Fourth Amendment secures the right of the people to be free from "unreasonable searches and seizures" and provides that "no warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The requirement of a warrant and probable cause, however, is not "an indispensable component of reasonableness." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). Rather, "the fundamental command" of the Fourth Amendment is that the search be reasonable, and "although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required.'" *N.J. v. T.L.O.*, 469 U.S. 325, 340-41 (1985) (quoting *Almeida-Sanchez v. United States*, 413 U.S. 266, 277 (1973) (Powell, J., concurring)).

For example, "where a Fourth Amendment intrusion serves *special governmental needs*, beyond the normal need for law enforcement," a warrantless search is justified when balancing the individual's privacy expectations against the govern-

ment's interests leads to the determination that it is "impractical to require a warrant or some level of individualized suspicion in the particular context." *Von Raab*, 489 U.S. at 665-66 (emphasis added). The Supreme Court has recognized numerous circumstances in which special governmental needs justify searches without the need for individualized suspicion, warrants, and probable cause. *See*, *e.g.*, *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 454-55 (1990) (sobriety checkpoints); *Von Raab*, 489 U.S. at 677 (routine drug tests for certain U.S. Customs employees); *O'Connor v. Ortega*, 480 U.S. 709, 723-26 (1987) (searches of government employees' desks and offices); *T.L.O.*, 469 U.S. at 341-42 (searches of students in public schools); *cf. Hudson v. Palmer*, 468 U.S. 517, 525-28 (1984) (holding that a prisoner does not have an expectation of privacy in his prison cell protected by the Fourth Amendment because of the need for prison administrators to ensure security within the prison); *Samson v. California*, 547 U.S. 843, 857 (2006) (holding that suspicionless searches of parolees, conducted pursuant to a state statute, did not violate the Fourth Amendment); *Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987) (holding that a warrantless search of a probationer's home by a probation officer, conducted pursuant to a valid regulation, was reasonable).

Surely, if the special needs doctrine were applicable to searches in the military, the special need for "security, military fitness, [and] good order and discipline," *see* Mil. R. Evid. 313(b), would provide an overwhelming justification for regular inspections. But the constitutional status and needs of the military demand more than the application of a balancing test, as called for by the special needs doctrine. *See United States v. Jenkins*, 986 F.2d 76, 78 (4th Cir. 1993); *see also* U.S. Const. art. I, § 8, cl. 14. In *Jenkins*, we held that the validity of a search on a closed military base, conducted without particularized suspicion, does not "turn on the case-by-case application of a 'special needs' or 'exigent circumstances' balancing test. The case law makes clear that searches on closed military bases have long been exempt from

the usual Fourth Amendment requirement of probable cause." *Jenkins*, 986 F.2d at 78.

The Supreme Court has recognized that under Article I, Section 8, Clause 14 of the Constitution, Congress is given plenary power to make military law, and military law "is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson*, 346 U.S. 137, 140 (1953); *see also Solorio v. United States*, 483 U.S. 435, 441 (1987). In *Solorio*, the Court quoted approvingly the *Federalist* papers, which assert that these military powers "ought to exist without limitation, because it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them . . . ." *Solorio*, 483 U.S. at 441 (quoting *The Federalist* No. 23 (Alexander Hamilton)).

Nonetheless, the Fourth Amendment protects members of the armed services from unreasonable searches and seizures, *see Henson*, 27 Fed. Cl. at 592-93, albeit with different standards than those that apply in the civilian context. The Supreme Court "has long recognized that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy*, 417 U.S. 733, 743 (1974). Because "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953), reasonable expectations of privacy in the military society will differ from those in the civilian society. Accordingly, "[t]he fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Parker*, 417 U.S. at 758; *see also United States v. Grisby*, 335 F.2d 652, 656 (4th Cir. 1964) ("Different standards apply to military personnel, but that is not because the Constitution does not reach military courts but because military personnel are subject to military control and to military law").

Among these permissible military intrusions is "the traditional military inspection which looks at the overall fitness of a unit to perform its military mission [and] is a permissible deviation from what may be tolerated in civilian society generally—recognizing that such procedure is a reasonable intrusion *which a serviceperson must expect in a military society*." *United States v. Middleton*, 10 M.J. 123, 128 (C.M.A. 1981) (emphasis in original) (internal quotation marks omitted). As the Court of Military Appeals has summarized:

> [T]he [military] inspection has traditionally been a "tool" for a commander to use in insuring "the overall fitness of [his] unit to perform its military mission." It is part of a "disciplinary cost" to be paid by a citizen soldier in order to "shoulder his 'readiness' burden," and it is one of those intrusions which are "eminently reasonable as concomitant to the constitutional responsibility of the military service to be ready to defend the primary society."

*Id.* at 127-28 (citations omitted) (quoting *United States v. Wenzel*, 7 M.J. 95, 97 (C.M.A. 1979); *United States v. Hessler*, 7 M.J. 9, 10 (C.M.A. 1979)).

Consequently, "during a traditional military inspection, no serviceperson whose area is subject to the inspection may reasonably expect any privacy which will be protected from the inspection. The service member would not normally expect it; and if he did, the parent society would not be willing to honor that expectation." *Middleton*, 10 M.J. at 128 (footnote omitted).

A traditional "military inspection" is understood to be the "examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle, including an examination conducted at entrance and exit points, conducted as an incident of command the primary purpose of which is to

determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle." Mil. R. Evid. 313(b). Military Rule of Evidence 313(b) also explains that an inspection may include, but is not limited to, examinations "to locate and confiscate unlawful weapons and other contraband." *Id.*

Although an inspection may properly be designated to confiscate contraband, it may not serve as a search undertaken pursuant to a particularized suspicion of a person or a crime. *See* Mil. R. Evid. 313(b); *Middleton*, 10 M.J. at 131-32; *see also United States v. Thatcher*, 28 M.J. 20, 24 (C.M.A. 1989). Such searches are governed by Military Rules of Evidence 314 and 315 and by the more generally applicable principles of the Fourth Amendment. And if such a search is conducted through the subterfuge of an inspection, a violation of the Fourth Amendment can result. *See Thatcher*, 28 M.J. at 24 ("[I]f an intrusion on privacy is really an 'inspection' and complies with Mil. R. Evid. 313, no reasonable expectation of privacy has been violated; but if the purported inspection is only a subterfuge for a search or is not properly conducted, then a violation has occurred").

In this case, as noted above, there is no evidence in the record that anyone had a particularized suspicion of Rendon when he was first inspected, nor is there any evidence that he was treated any differently from any other soldier entering the unit. The search of his personal property was conducted pursuant to a regularly scheduled intake protocol for new members of the unit, and the search stayed within the parameters authorized by the commanding officer in the DSCB Handbook and defined in Military Rule of Evidence 313. Even though a purpose of the search was the detection of contraband, it appropriately related to the good order and discipline of the unit. The search was, therefore, a valid military inspection, conducted as part of the regular procedure performed for all entrants into the unit to ensure discipline within the unit and service members' compliance with military rules. *See*

*United States v. Hay*, 3 M.J. 654, 656 (A.C.M.R. 1977). Because the search of Rendon's MP3 player was conducted as part of a valid military inspection, no reasonable expectation of privacy in its contents was violated.

The fact, as Rendon suggests, that officers conducting the search may have referred to the search as an "inventory" of Rendon's belongings rather than a military "inspection" does not affect its validity, since it is the substance and purpose of the search that is the focus of Military Rule of Evidence 313. There is no doubt that the search conducted in the present case, in scope and in purpose, was a valid military inspection, conducted in compliance with Military Rule of Evidence 313, regardless of whether it was labeled as an "inventory" or an "inspection" by individual officers.

Finally, the fact that individualized suspicion of Rendon existed when Sergeant Quintana brought the images on Rendon's MP3 player to the attention of his superior officers, particularly Captain Horton, who examined the MP3 player, does not defeat the reasonableness of Captain Horton's examination. Use of the chain of command is "vital to the overall effectiveness of the Army," and military law invests commanding officers with broad authority to use it to ensure discipline and compliance with military rules among those under their command. Army Reg. 600-20, Army Command Policy, para. 2-1 (Apr. 18, 2008); *see also id.* paras. 4-1 to 4-7; *Greer v. Spock*, 424 U.S. 828, 840 (1976). Surely Sergeant Quintana was permitted, indeed required, to pass his findings up his chain of command to obtain direction as to how to proceed. And certainly Captain Horton, under whose authority Quintana had conducted the inspection, was permitted to examine the contents of Rendon's MP3 player to determine for himself whether a violation of the unit's rules had occurred. Any other result would not respect the hierarchical nature of military society. *See* Army Reg. 600-20, para. 2-1 ("Effective communication between senior and subordinate Soldiers within the

chain of command is crucial to the proper functioning of all units").

Moreover, because Quintana had already validly observed child pornography on Rendon's MP3 player, the subsequent verification by his commanding officers did not taint the warrant that was ultimately issued. Quintana's discovery would inevitably have led to Horton's consultation with the CID and could alone have served as the basis for a search warrant for Rendon's residence. *See United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987) ("[W]here it appears that evidence 'inevitably would have been discovered by lawful means,' the deterrence rationale of the exclusionary rule has 'so little basis' that the rule should not be applied" (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984))).

In sum, because Rendon's MP3 player was inspected pursuant to a valid military inspection, contraband discovered during the course of that inspection could be seized and turned over to civilian authorities. And what we said in *Grisby* is thus equally applicable here:

> Since the search of living quarters on a military installation occupied by one subject to military law was constitutionally valid as a matter of military law, the District Court properly recognized it as being not constitutionally unreasonable or invalid and properly refused to suppress as evidence the fruits of the search.

*Grisby*, 335 F.2d at 656.

The judgment of the district court denying Rendon's motion to suppress is accordingly

*AFFIRMED*.