Affirmed by published opinion. Judge AGEE wrote the majority opinion, in which Judge KEENAN joined. Judge DAVIS wrote a dissenting opinion.
OPINION
AGEE, Circuit Judge:
A jury convicted Earl Whittley Davis of various federal offenses arising from a course of conduct that included the armed robbery and murder during that robbery of an armored car employee, Jason Schwindler, as well as a subsequent carjacking.[1] On appeal, Davis challenges the *229 use of DNA evidence against him at trial, and also argues that the district court erred in excluding expert testimony proffered by Davis in an attempt to undermine an eyewitness identification of him. For the reasons set forth below, we affirm the judgment of the district court.
I.
All of Davis’ convictions arose from the same brief course of events occurring in Prince George’s County, Maryland. The district court accurately summarized the facts as follows:
On August 6, 2004, shortly before 1:00 p.m., Jason Schwindler, an armored car employee, picked up a bank deposit from a local business and took it to a nearby BB & T bank in Hyattsville, Maryland. As Schwindler walked up to the bank entrance, two [gunmen] exited a Jeep Cherokee and began shooting at Schwindler, killing him. When their escape in the Jeep was thwarted by the armored truck driver, the assailants carjacked a bank customer and fled in her vehicle!, a Pontiac Grand Am, which] was later recovered.
United States v. Davis, 657 F.Supp.2d 630, 635 (D.Md.2009).
After the murder, officers from the Prince George’s County Police Department (“PGCPD”) responded to the scene and collected numerous items of evidence, including a baseball cap worn by one of the shooters, two firearms, ammunition, and the steering wheel covers from the Jeep Cherokee and the Grand Am. After swabbing and analyzing the items for DNA, the profiles of the major contributors to the DNA found in the ball cap and on the triggers and grips of the recovered firearms were entered into the local Combined DNA Index System (“CODIS”) database.[2] A search of the local database led to a “cold hit” between the DNA recovered at the Schwindler murder scene and Davis’ DNA profile, which was already present in the local database.
Based on the “cold hit,” officers obtained a search warrant to obtain a sample of Davis’ DNA directly from him, which again matched the evidence from the Schwindler murder scene. Evidence of this second match was introduced at trial in this case.
Prior to trial, Davis filed a motion to suppress the use of all DNA evidence against him, arguing that his DNA profile had been obtained by police and entered into the local PGCPD DNA database in violation of his Fourth Amendment rights. The district court held an evidentiary hearing, but declined to rule on the motion to suppress immediately, instructing the parties to continue preparing for trial. After a jury found Davis guilty of the charges, the district court issued a lengthy written order denying the motion to suppress. Davis, 657 F.Supp.2d 630-67. Davis was sentenced by the district court on September 18, 2009 to a term of life imprisonment plus 420 months.[3]
Davis noted á timely appeal, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
*230 II.

Background and Proceedings Below

On August 29, 2000, almost four years before the Schwindler murder, Davis arrived at Howard County General Hospital with a gunshot wound to his leg. He claimed to be a robbery victim and reported that he had been shot by the purported robber. Hospital personnel called the police, as Maryland law required, and Patrol Officer Joseph King of the Howard County, Maryland, Police Department (“HCPD”) responded to the call.[4] Officer King found Davis lying on a bed in the emergency room. . He was conscious, sitting up, and able to converse with Officer King at the time. Davis’ pants and boxer shorts had been removed by hospital personnel and placed in a plastic hospital bag, which was stored on a shelf beneath the bed. Officer King observed Davis’ gunshot wound and secured Davis’ pants and boxer shorts as evidence of the reported shooting. He did so without express permission from Davis (although Davis saw him take the.clothing) and without a warrant. He then gave those items to his colleague, Detective Steven Lampe, who placed them in the HCPD “property room,” to be held as evidence in the prosecution of Davis’ assailant.
At the suppression hearing, Officer King testified that he could not recall exactly what the bag looked like containing Davis’ clothes, and . neither could . Detective Lampe, except that the bag was “plastic,” (J.A. 166.) Officer King testified, however, that he had “responded to the hospital on numerous calls,” that he knew it was the hospital’s “practice to secure any property” taken from a patient and that the hospital placed that “[cjlothing from a victim ... under [the patient’s] bed.” (J.A. 147.) He also testified that he did not need “permission from anyone in the hospital to access” the bag. (J.A. 150.)
No one was ever charged in the August 2000 shooting of Davis, and neither his clothing nor the blood on it were ever tested in connection with that shooting. Davis was not contacted or advised that the shooting investigation was no longer being pursued by the HCPD, nor was he offered the opportunity to retrieve his clothing. Instead, Davis’ clothes, containing his DNA material,[5] were simply retained by the HCPD.
In order to give a more complete picture of later events, we note certain additional facts concerning Davis’ hospital stay. First, although Davis had given a false name and false driver’s license upon his admission to the hospital, police later learned his true identity through fingerprinting analysis. Additionally, from the beginning of their questioning of Davis, Officer King and Detective Lampe believed Davis was being uncooperative so they conducted further investigation. That investigation led to the discovery of marijuana in the vehicle in which Davis had arrived at the hospital, as well as several other potentially incriminating items, such as a t-shirt and a ball cap that said “FBI,” a handheld radio, leg shackles, gloves, and a mask. As a result, Davis was arrested on drug charges upon his *231 release from the hospital, but those charges were later dropped.
The government does not dispute that Davis’ clothing was seized initially because it was evidence of a crime in which he was a victim. The clothing was logged into the HCPD property room, however, on the same sheet with the marijuana found in the car and the false ID card Davis had presented. It also was Davis’ arrest record on the drug offense that later led the PGCPD to inquire and learn about the existence of the seized clothing. Davis, 657 F.Supp.2d at 634-35 (noting that in April 2004, Lampe “was contacted by members of [PGCPD], who asked him questions about the arrest of Earl Davis in 2000.”). When the clothing was later checked out to the PGCPD for testing in a subsequent murder investigation, however, the form indicated that the clothes and blood were from the victim of a shooting. In effect, then, Davis had a “dual status” throughout the events in this case — he was both victim and arrestee — a fact which becomes important when analyzing his Fourth Amendment claims.
In June 2001, an individual named Michael Neal was murdered in Prince George’s County. In April 2004, a PGCPD homicide detective investigating the Neal murder, Detective K. Jernigan, learned that Davis had previously been arrested in Howard County and that the HCPD had Davis’ clothes. The PGCPD suspected Davis was involved in the Neal murder.[6] As a result, they requested and obtained Davis’ clothing, without a warrant, from the HCPD.
In June 2004, the PGCPD extracted Davis’ DNA from the blood stains on Davis’ pants, again without a warrant, and created a DNA profile from the test results. That DNA was compared to an unknown DNA sample recovered from the scene of the Neal homicide, but there was no match. Despite the fact that Davis’ DNA profile excluded him as the source of the evidentiary sample from the Neal murder, the PGCPD nonetheless retained his DNA profile, and approximately one week later, included it in their local DNA database.
At a hearing before a Maryland state court in its Sehwindler murder prosecution,[7] which is part of the record before us, the DNA analyst for the PGCPD, Julie Kempton, testified concerning the extraction of Davis’ profile and its entry into the local database. She testified that she was told by a detective that the boxer shorts were taken “from a suspect, from a hospital emergency room where he had been brought in [she] believefd] for a shooting[.]” (Supp. J.A. 93.) She further testified that her testing ultimately excluded Davis’ profile as a match in the Neal homicide. (Supp. J.A. 93-94.) She also testified that she knew that, at the state level of the CODIS database, a suspect’s profile should be deleted if the court ordered expungement based on a vacated conviction. The record does not disclose any *232 other information as to Why the profile was retained, whether that was a common policy or practice, or whether it violated any local rule, regulation, policy, or practice to do so.[8]
As noted earlier, in the course of the investigation of the robbery and murder of Mr. Schwindler, when the DNA profile recovered from the Schwindler crime scene was entered into the PGCPD DNA database, a “cold hit” resulted with the DNA sample that had been lifted from Davis’ clothing. The PGCPD then secured a search warrant to obtain a DNA sample directly from Davis. That subsequent DNA profile of Davis also matched the DNA samples from the Schwindler crime scene.
Evidence of the match between the known sample obtained via the search warrant and the crime scene evidence was introduced at Davis’ trial. Specifically, DNA analyst Sarah Chenoweth testified that Davis’ DNA matched DNA profiles from the baseball cap. and both cars’ steering wheel covers, and testified as to the infinitesimally small probabilities that the DNA on those items came from any person other than Davis.[9]
Davis moved to suppress the DNA evidence against him, arguing that it was obtained in violation of the Fourth Amendment. In a lengthy order denying suppression, the district court addressed each of Davis’ challenges. The court concluded that Davis’ Fourth Amendment rights were violated only when his DNA profile was retained in the local DNA database, after Davis’ profile did not match the DNA sample from the Neal murder, but found no other violations. As to the retention of Davis’ profile, the court concluded that the “good faith” exception should be applied and thus the application of the exclusionary rule was not warranted.
III.

Davis’ Challenge to the DNA Evidence

Davis alleges three separate Fourth Amendment violations regarding the collection and retention of his DNA. Specifically, Davis asserts that each of the following actions by police constituted a Fourth Amendment violation: (1) the seizure of his clothing from the hospital room and its subsequent search; (2) the extraction of his DNA profile and testing in connection with the Neal murder investigation; and (3) the retention of his DNA profile in the local DNA database.[10]
For the reasons discussed below, we agree with the district court that no Fourth Amendment violation occurred in the seizure of- the bag containing Davis’ clothing at the hospital. We also agree that any subsequent “search” of the bag was not unlawful because its contents were a foregone conclusion, based in part on Officer King’s uncontradicted testimony that he,saw “a bag underneath of [Davis’] hospital bed that contained clothing.”[11] We further determine that there was a *233 Fourth Amendment violation when the PGCPD extracted Davis’ DNA profile from his clothing and tested it as part of the Neal murder investigation. We assume, without deciding, that there was a separate Fourth Amendment violation in retaining Davis’ DNA profile in the local CODIS database. Finally, we conclude that the “good faith exception” to the exclusionary rule applies here to both violations and thus the DNA evidence was not required to be excluded.
We review the factual findings underlying a motion to suppress for clear error and the' district court’s legal determinations de novo. Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Rusher, 966 F.2d 868, 873 (4th Cir.1992). When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government. United States v. Seidman, 156 F.3d 542, 547 (4th Cir.1998).
A.

The Seizure of Davis’ Clothing in His Hospital Room

Davis first argues that the seizure of his clothing from his hospital room constituted a warrantless seizure that was not justified by any exception to the warrant requirement. The government contends that both the seizure and the subsequent search of the bag containing the clothing were justified by the “plain ’view” exception, as the. district court concluded.[12]
For the plain view exception to the warrant rule to apply, the government must show that: (1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a “lawful right of access” to the seized items; and (3) the incriminating character of the items was immediately apparent. See United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir.1997). Davis concedes that Officer King was lawfully in the hospital room and thus that the government has satisfied the first requirement, but argues that the government failed to satisfy the latter two requirements. We disagree.
As to the second requirement, Davis contends that, even though Officer King was in the room lawfully, he did not have lawful access to the bag of clothing. The case most heavily relied upon by Davis, United States v. Neely, 345 F.3d 366 (5th *234 Cir.2003), is inapposite. In Neely, the Fifth Circuit held the plain view doctrine did not allow the seizure of the patient’s, clothing, because the clothing at issue was not in open view but in the.hospital property storage room, and required permission from hospital personnel to retrieve it. Id. at 368, 371. Notably, the hospital patient in Neely was the suspect in a criminal investigation, not the victim of a crime like Davis. Id. at 367-68.
Neely aside, we have no difficulty finding that there was lawful access to the clothing here. As suggested in Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the lawful access requirement is intended to clarify that police may not enter a premises to make a warrantless seizure, even if they could otherwise see (from a lawful vantage point) that there was contraband in plain sight. Id. at 137 & n. 7, 110 S.Ct. 2301 (describing the second requirement and explaining that even if “[incontrovertible testimony of the senses” establishes that an object in plain view is contraband, “the police may not enter and make a warrantless seizure”); see also Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir.2004) (the “lawful right of access” requirement “is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances”; thus, while “lawfully positioned” “refers, to where the officer stands when she sees the item,” “lawful right of access” refers “to where she must be to retrieve the item”). The exam-pie given by the government in this case is apt, i.e., the analysis of the first and second prongs might be different if “the officer were lawfully present outside a building, peering through a window into a room in which he would not be lawfully present.” (Appellee’s Br. 32 n. 8.) Here, however, there is no dispute that Officer King was lawfully present in the hospital room, and he thus had lawful access in the ordinary course of his investigation to the bag of clothing which could be evidence against Davis’ assailant.[13] See Washington v. Chrisman, 455 U.S. 1, 8, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) (“when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an individual’s area of privacy ...[,] the Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances.”); see also infra at 237-38 (discussing cases permitting seizure of blood-stained clothing in plain view).
The third prong of the plain view doctrine is less readily resolved. Nonetheless, having carefully reviewed the district court’s ruling on this point, we find no clear error in its factual findings, nor any error in its legal conclusions.
Davis’ primary argument is that while the bag may have been in plain view, the clothes were not. Thus, he contends that both the seizure and any subsequent search of the bag violated his constitutional rights. The seizure implicated Davis’ possessory interest in his clothing, and any subsequent search implicated his privacy interest. See Texas v. Brown, 460 U.S. *235 730, 747, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring in the judgment). As Davis’ arguments on this issue acknowledge, under the facts here, the two concepts overlap. Specifically, the seizure of the bag was warranted under the plain view exception only if it was immediately apparent that it contained incriminating evidence. Here, that would require it be immediately apparent that the bag contained evidence of a crime, i.e., Davis’ clothing possessing blood, trace evidence, and/or a bullet hole. Similarly, the subsequent search of the bag (whether to identify or examine its contents), was warranted if it was a foregone conclusion that the bag contained the clothing, which was evidence of a crime.
As to both the seizure of the bag and any subsequent search of the bag, the district court’s reliance on United States v. Williams, 41 F.3d 192 (4th Cir.1994) was appropriate. In Williams, officers had properly seized five packages, which consisted of a brown, opaque material wrapped in heavy cellophane. Id. at 197-98. The defendant challenged the subsequent warrantless search, in .which a police officer removed the cellophane wrapping from one of the packages, poked a hole in the opaque material surrounding its contents, removed a small quantity of white powder and field tested the powder, which tested positive for cocaine. Id. at 194.
The Williams, Court explained that a search of such a container is permissible under the plain view doctrine when “the contents of a seized container are a foregone conclusion.” Id. at 197. That is, “when a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view.” Id. (citations omitted). Williams clearly stated that, “[i]n determining whether the contents of a container are a foregone conclusion, the circumstances under which an officer finds the container may add to the apparent nature of its contents.” Id. (citing Blair v. United States, 665 F.2d 500, 507 (4th Cir.1981)).
Williams also quite plainly allows the experience of the officer to be taken into account when determining whether a container’s contents are a “foregone conclusion.” Id. at 198. There, the Court relied on the testimony of the police officer that, based on his ten years of experience, packages wrapped in this manner contained narcotics, to support the Court’s holding that the contents of the container were a “foregone conclusion.” Id. at 194, 198. The Court also noted that the other items found in the suitcase with the wrapped packages (towels, dirty blankets, and a shirt with a cigarette burn) were unusual for a traveler, in that they did not contain clothing or other items a person normally carries when traveling across the country. Id. Thus, in conducting this inquiry, we consider both the circumstances under which the container here was found and Officer King’s knowledge about this particular hospital’s practices and procedures and his experience in responding to the hospital bedsides of gunshot victims in this particular hospital.[14]
Here, Officer King testified, without contradiction or challenge, that when he entered the curtained-off area where he was told Davis would be, he saw Davis on a hospital bed and observed “a bag underneath of the hospital bed that contained *236 clothing.” (J.A. 140.) He did not testify that he walked into the area and saw what he thought might be a bag of clothing under the bed. Drawing the inferences from the facts in the government’s favor, as we must, see Seidman, 156 F.3d at 547, that testimony fairly supports an inference that Officer King could see the clothing through the bag or that the bag was partially open, revealing clothing. Nothing in the record contradicts such a conclusion. Because the officers were not asked whether the bag was open or closed and could not recall precisely what the bag looked like, however, we do not know for certain “whether the bag was open or closed, or whether it was transparent, opaque or somewhere in-between,” Davis, 657 F.Supp.2d at 638.[15] What is clear from this record is that Officer King expressed no doubt he observed “a bag ... that contained clothing.” (J.A. 140.) Thus, we disagree with the dissent’s contention that Officer King’s testimony was equivocal, or that his testimony fails to rise to the level of certainty required in Williams. See post at 274-75.[16]
Officer King also testified that it was the practice and procedure of the hospital to place a patient’s clothing in a bag on the shelf under his bed. He further could visibly see that Davis had been shot in his upper right thigh, and that Davis was no longer wearing pants or underwear. Instead, while Davis was wearing clothing on his upper body, his lower body was exposed, except for his genital area, which was covered by a sheet. {See Supp. J.A. 73 (picture of Davis in hospital bed); J.A. 141 (testimony of Officer King that picture accurately depicted what Davis was wearing)).
We agree with the district court that “the totality of the circumstances, taking into account [Officer] King’s experience with the hospital’s practices regarding patients’ property, the appearance of the Defendant at the time [Officer] King spoke with him, and the obvious fact that the Defendant had been shot in an area of the body usually covered by clothing” support the determination that it was a foregone conclusion the bag under Davis’ hospital bed contained the clothing he wore when he was shot.
Davis alternatively contends that even if it had been a virtual-certainty that the bag contained Davis’ clothing, the incriminating nature of those clothes was not “immediately apparent.” We have little trouble, however, in concluding that Davis’ pants almost certainly would contain both blood and a bullet hole,[17] and would thus *237 be incriminating evidence in the prosecution of the shooter. Such a conclusion is based on the circumstances, Davis’ appearance, and the location of his bullet wound. As noted by the district court, moreover, Davis has provided no authority to support imposing a requirement that the evidence be incriminating against the person from whom it is seized. Davis, 657 F.Supp.2d at 640. As the district court reasoned:
[The defendant’s failure to provide any authority] may be due to the unique situation presented by the facts of this case; very rarely will a victim from whom evidence is seized later become a criminal defendant with standing and reason to challenge the previous seizure. As a matter of first impression, however, it would seem unwise and overly restrictive to require police to know who will be incriminated by an item in plain view before they are able to seize it and investigate further.

Id.

Indeed, Supreme Court cases and authority from other circuits explain that an item need not itself be contraband before it has an “incriminating nature,” but instead, an item need only be evidence of a crime. Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (Rehnquist, J., plurality opinion) (discussing plain view doctrine and whether items may be “contraband or stolen property or useful as evidence of a crime ”) (emphasis added); United States v. Smith, 459 F.3d 1276, 1293 (11th Cir.2006) (“the scope of the ‘plain view’ doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant”); United States v. Rodriguez, 601 F.3d 402, 407 (5th Cir. 2010) (“The incriminating nature of an item is ‘immediately apparent’ if the officers have ‘probable cause’ to believe that the item is either evidence of a crime or contraband.”) (emphasis added and citation omitted); United States v. Chipps, 410 F.3d 438, 443 (8th Cir.2005) (warrantless seizure of a sweatshirt on the ground outside a house where there had been a reported assault was justified by the plain view doctrine, since “the incriminating nature of a bloody sweatshirt at the site of a potential assault was obvious” and the officer “had a legal right to access the shirt— it was right in front of him on the ground”); Chavis v. Wainwright, 488 F.2d 1077, 1078 (5th Cir.1973) (clothing in plastic hospital bag was properly seized from stabbing victim in hospital without a warrant as evidence of an assault, despite fact that victim told police he did not want to prosecute his assailant girlfriend).[18] Here, like the bloody clothing in Chipps and in Chavis, the pants with a bullet hole, which would be clear evidence a shooting oc *238 curred and might reasonably provide scientific evidence related to the gun caliber, distance, etc., is evidence of a crime and hence, has an immediately apparent “incriminating nature.”[19]
For all of the foregoing reasons, we conclude that the plain view doctrine justified both the warrantless seizure and the subsequent search of the bag containing the clothing under Davis’ hospital bed.
Before turning to the issues surrounding the extraction and testing of Davis’ DNA, we respond briefly to two points raised by the dissent regarding the seizure and search of the clothing and our application of Williams. First, the dissent argues Williams is distinguishable on the grounds that the district court here considered only extrinsic evidence, while the Williams court considered such extrinsic evidence in addition to the physical appearance and character of the container. Relatedly, the dissent further states, without citation to authority, that “[njarcotics packaging is so readily recognizable as to rise to the level of the archetypal kit of burglar tools or a gun case,” while the bag here was not *239 “distinctive in any way.” Post at 274-75, 275. We disagree.
The dissent’s assertions that drug packaging is “readily recognizable” as such while a bag containing a hospital patient’s clothing is not, is true only if the contextual evidence present in Williams is being taken into account, i.e., the fact that the packaging was in a suitcase with very few other items one would suspect to find in a traveler’s luggage, and the contextual evidence here is ignored, i.e., that the bag was underneath a gunshot victim’s hospital bed. But Williams expressly permits us to consider the context and circumstances of the specific case, as well as the experience of the officer. Here, those factors compel the conclusion that the bag under Davis’ bed contained his clothing.[20]
Second, the dissent suggests an inconsistency between our upholding the seizure of Davis’ clothing at the hospital (which obviously contained his DNA), but concluding that he had a reasonable expectation of privacy in his DNA such that its later use violated his Fourth Amendment rights. See post at 275-76 (it is “curious, to say the least, to reason as does the majority that Davis retained, for several years after the bag was seized at the hospital, a reasonable expectation of privacy in the character of his DNA molecules, but that he lacked any reasonable expectation of privacy in the presence of those molecules in his blood while they were embedded in his clothing” while at the hospital). This perceived inconsistency is based on a misunderstanding of our holding.
We do not hold that Davis had no expectation of privacy in his DNA while it was on his clothing at the hospital. What we conclude is that the seizure and search of the bag containing Davis’ clothing were permitted under the plain view doctrine because his clothing was evidence of a crime and was in plain view, as applied in Williams. See infra at 244 (“while Davis may not have had any expectation of privacy in the outward appearance of the clothing once it was in police custody, we nevertheless must consider ... whether Davis retained a reasonable expectation of privacy in his DNA on the clothing or in the DNA profile obtained from it.”)
Davis always had an expectation of privacy in his DNA, but that expectation of privacy was not implicated merely by an effort to identify, describe and catalogue his clothing as evidence of a reported crime, rather than testing anything found on it. It was not until the police sought to obtain a DNA profile from his blood that his privacy interest in his DNA was implicated. As we explain, the search of his DNA did not occur until the police extracted and tested his DNA in conjunction with the Neal murder. See infra at Section III.B.2. The dissent’s perceived “inconsistency” in our holdings does not exist.[21]
*240 B.

The Extraction and Testing of Davis’ DNA Profile for Use in the Neal Murder Investigation, and the Retention of Davis’ DNA Profile

Having concluded that the HCPD lawfully obtained the clothing that contained Davis’ DNA material, we now turn to Davis’ contention that the PGCPD violated the Fourth Amendment by extracting his DNA from the blood on that clothing and testing it for use in the Neal murder investigation, as well as in retaining his profile in their local DNA database.
1.

General Fourth Amendment Principles

The general issue of a person’s reasonable expectation of privacy in his DNA is a developing and unsettled area of the law, one that has not yet been addressed by the Supreme Court. The relative recency of the technology, especially when coupled with its potential power, is no doubt part of the reason why there is uncertainty over the degree of privacy persons can reasonably expect to have in their DNA. Cf Dist. Attorney’s Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 129 S.Ct. 2308, 2316, 174 L.Ed.2d 38 (2009) (“Modern DNA testing can provide powerful new evidence unlike ■ anything known before ... DNA testing has exonerated wrongly convicted people, and has confirmed the convictions of many others.”); Jones v. Murray, 962 F.2d 302, 307 (4th Cir.1992) (describing DNA as a “dramatic new tool for the law enforcement effort to match suspects and criminal conduct”).[22]
*241 The Fourth Amendment provides that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” U.S. Const, amend. IV. However, the protections of the Fourth Amendment are activated only when the state conducts a search or seizure in an area in which there is a “constitutionally protected reasonable expectation of privacy.” New York v. Class, 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (citation omitted). When there-is no reasonable expectation of privacy, the Fourth Amendment is not implicated.[23] See, e.g., United States v. Dionisio, 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (no reasonable expectation of privacy in one’s voice); United States v. Mara, 410 U.S. 19, 21, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973) (no reasonable expectation of privacy in one’s handwriting); California v. Greenwood, 486 U.S. 35, 37, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (same as to trash left by the curb). A search or seizure for Fourth Amendment purposes does not occur, therefore, when a person lacks a reasonable expectation of privacy in the material examined. United States v. Brezo, 308 F.3d 430, 433 (4th Cir.2002) (citing Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983)).
Even if a search has occurred without a warrant and without individualized suspicion, a Fourth Amendment violation does not necessarily occur. The Fourth Amendment does not prohibit all searches, only those that are unreasonable. Skinner v. Ry. Labor Execs.’ Ass’n, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (“the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable”); Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (“[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and-seizures.”) (quoting Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (I960)). And “[ajlthough as a general matter, warrantless searches ‘are per se unreasonable under the Fourth Amendment,’ there are ‘a few specifically estab *242 lished and well-delineated exceptions’ to that general rule.” City of Ontario, Ca. v. Quon, — U.S. -, 130 S.Ct. 2619, 2630, 177 L.Ed.2d 216, (2010) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); Nat’l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (“neither a warrant nor probable cause, nor,' indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance”).
2.

Whether Extraction and Testing of Davis’ DNA Profile for Use in the Neal Murder Investigation, or its Later Retention, Constituted Searches?

We first consider the threshold question whether a search occurred when the PGCPD extracted and tested Davis’ DNA for use in the Neal murder investigation, or when the PGCPD retained Davis’ DNA profile in CODIS. Our analysis turns on the question whether Davis had a reasonable expectation of privacy in his clothing and the blood and DNA it contained, once it was in the lawful custody of the HCPD.
The government argues that there was no search or seizure here, relying primarily on United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), for the proposition that Davis lacked any reasonable expectation of privacy in his clothes or DNA after they were lawfully seized by police.[24] In Edwards, the defendant was arrested and charged with an attempted break-in at approximately 11:00 p.m., taken to the local jail and placed in a cell. 415 U.S. at 801, 94 S.Ct. 1234. Investigation at the scene revealed that the attempted entry had been made through a wooden window and that paint chips had been left on the window sill and wire mesh. Id. at 801-02, 94 S.Ct. 1234. The next morning (approximately ten hours after his arrest), Edwards was- given a change of clothing and his clothing was then taken from him and held as evidence. Id. at 802, 94 S.Ct. 1234. Examination of the clothing revealed paint chips matching the samples taken from the window. Id. The evidence of the matching paint chips was later introduced at trial, over Edwards’ objection. Id. The Sixth Circuit reversed, finding the seizure of the clothing, carried out after “the mechanics of [Edwards’] arrest” had been completed, violated the Fourth Amendment. Id.
The Supreme Court reversed the Sixth Circuit, holding that the warrantless seizure of the clothing was constitutional. The Supreme Court first noted that warrantless searches are permitted incident to custodial arrests, and that they can legally be conducted later when the accused arrives at the place of detention. Id. at 802- *243 03, 94 S.Ct. 1234. “Nor is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention and later subjected to laboratory analysis or that the test results are admissible at trial.” Id. at 803-04, 94 S.Ct. 1234.
The government reads Edwards to stand for the proposition that once the police have lawful custody of evidence, like Davis’ clothing here, further scientific examination conducted on it by that particular police department or by any other law enforcement body does not first require that a search warrant be obtained. (See Appellee’s Br. 46.) As a result, the government argues, Davis did not have a reasonable expectation of privacy in the DNA contained in his clothing because it had been lawfully seized by the HCPD. The government accordingly contends that the PGCPD did not violate the Fourth Amendment when the PGCPD later obtained Davis’ clothing and extracted the DNA at issue.
The Court in Edwards, however, did not adopt the categorical rule advanced by the government:
In upholding this search and seizure, we do not conclude that the Warrant Clause of the Fourth Amendment is never applicable to postarrest seizures of the effects of an arrestee. But we do think that the Court of Appeals for the First Circuit captured the essence of situations like this when it said in United States v. DeLeo, 422 F.2d 487, 493 (1970) (footnote omitted): “While the legal arrest of a person should not destroy the privacy of his premises, it does — for at least a reasonable time and to a reasonable extent — take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.”
415 U.S. at 808-09, 94 S.Ct. 1234 (footnote omitted and emphasis added); id. at 808 n. 9, 94 S.Ct. 1234 (“Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct must still be tested by the Fourth Amendment’s general proscription against unreasonable searches and seizures.”) (internal quotation marks and alteration omitted).
In Edwards, the class of person whose item was seized, an arrestee, and the type of item seized, evidence, were material considerations in the Court’s analysis. Further, Edwards recognized that even an arrestee, who has a diminished expectation of privacy, does not forfeit forever all privacy interests in his effects. Therefore, the Edwards decision itself does not support the government’s broad categorical assertion that any item in the lawful custody of law enforcement can be subjected to laboratory analysis at any later time and for any purpose related to law enforcement.
Moreover, because the analysis of biological samples, such as those derived from blood, urine, or other bodily fluids, can reveal “physiological data” and a “host of private medical facts,” such analyses may “intrude[ ] upon expectations of privacy that society has long recognized as reasonable.” Skinner, 489 U.S. at 616-17, 109 S.Ct. 1402. Therefore, such analyses often qualify as a search under the Fourth Amendment. Id. at 618, 109 S.Ct. 1402 (concluding that “the collection and subsequent analysis of the requisite biological [blood and urine] samples must be deemed Fourth Amendment searches”). Similarly, an analysis required to obtain' a DNA profile, like the chemical analysis of blood and urine at issue in Skinner, generally qualifies as a search, because an individual retains a legitimate expectation of privacy in *244 the information obtained from the testing. See, e.g., United States v. Mitchell, 652 F.3d 387, 407 (3d Cir.2011) (en banc) (after discussing the Fourth Amendment search that occurs when a DNA sample is collected directly from a person’s body, discussing separately “[t]he second ‘search’ at issue,” which was, “of course, the processing of the DNA sample and creation of the DNA profile for CODIS. This search also has the potential to infringe upon privacy interests.”).
By contrast, in Edwards, the analysis at issue examined paint chips found in the defendant’s clothing, which did not implicate the privacy concerns inherent in the use of physiological and medical information obtained from DNA analysis that was addressed in Skinner. See Edwards, 415 U.S. at 801-02, 94 S.Ct. 1234. Thus, in the present case, while Davis may not have had any expectation of privacy in the outward appearance of the clothing once it was in police custody, we nevertheless must consider the type of analysis conducted on that clothing to determine whether Davis retained a reasonable expectation of privacy in his DNA on the clothing, or in the DNA profile obtained from it.
The district court concluded that Edwards is inapplicable here because, unlike the defendant’s clothing in Edwards, Davis’ clothing was not seized pursuant to his arrest on the drug charges, but was seized before his arrest when his status was that of a reported crime victim. As noted by the district court, to allow the testing and retention of DNA profiles from any evidence lawfully obtained by police could expose a victim of a crime whose blood, or other material from which DNA could be obtained, to having his or her DNA extracted and retained indefinitely in a law enforcement database. The district court reasoned:
Taken to its logical extreme, the application of Edwards and its progeny to the instant case would mean that any citizen whose blood finds its way into lawful police custody as a result of victimization (e.g., child abuse, sexual assault and domestic violence victims, etc.), would then lose any expectation of privacy in the DNA markers in that blood, which could be used against him or her at a later date without the constitutional safeguard that a warrant supported by probable cause first be issued.
Id. at 647. It was on this basis, the distinction between the DNA of a victim and an arrestee, that the district court found Edwards inapplicable.
Although we are not faced here with the full range of potential problems identified by the district court, we agree with the district court that a person who is solely a crime victim does not lose all reasonable expectation of privacy in his or her DNA material simply because it has come into the lawful possession of the police. And, although Davis later was arrested, because the police seized his clothing when he was solely a crime victim, we conclude that his later arrest does not eradicate his expectation of privacy in his DNA material.
Our conclusion that Davis’ status as a victim materially distinguishes the present case from Edwards is supported by our precedent and by decisions of our sister circuits. These decisions, in addressing whether, and under what circumstances, the Constitution allows the collection of DNA sarnples, uniformly recognize that persons who have not been arrested have a greater privacy interest in their DNA than would persons who have been arrested, such as the arrestee in Edwards.
First, our decision in Jones v. Murray, 962 F.2d 302 (4th Cir.1992), is instructive. There, we rejected a Fourth Amendment *245 challenge to a Virginia law that required convicted felons in custody to submit blood samples for DNA analysis. We concluded that the identification of a person arrested upon probable cause “becomes a matter of legitimate state interest and he can hardly claim privacy in it.” Id. at 306. Additionally, we recognized that “we do not accept even [a] small level of intrusion, [such as fingerprinting] for free persons without Fourth Amendment constraint.” Id. at 306-07 (citing Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)). Thus, we emphasized that a court’s constitutional analysis may differ depending on whether the person is an arrestee or a “free person.”
Our sister circuits, in upholding DNA collection statutes against Fourth Amendment challenges, likewise have recognized that the status of an individual whose DNA is sought is material to the issue whether he had a reasonable expectation of privacy in that DNA. In Mitchell, for example, the Third Circuit sitting en banc upheld the suspicionless collection of DNA samples from arrestees principally on the basis that the fingerprinting of arrestees did not violate the Fourth Amendment. 652 F.3d at 411 (citing Hayes v. Florida, 470 U.S. 811, 813-18, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) and Davis, 394 U.S. at 727, 89 S.Ct. 1394); see also Mitchell, 652 F.3d at 402 & n. 13 (collecting authority and noting that “[e]very federal circuit court to have considered [the federal DNA Act and its state law analogues] as applied to an individual who has been convicted and is either incarcerated or on probation, parole, or supervised release has upheld the constitutionality of the challenged statute”). Additionally, in United States v. Kincade, 379 F.3d 813 (9th Cir.2004) (en banc), a plurality of the Ninth Circuit held that the federal DNA act requiring the collection of DNA samples from convicted felons was constitutional. See 379 F.3d at 835-36 (O’Scannlain, J., plurality opinion) (noting “the obvious and significant distinction between the DNA profiling of law-abiding citizens who are passing through some transient status (e.g., newborns, students, passengers in a car or on a plane) and lawfully adjudicated criminals whose proven conduct substantially heightens the government’s interest in monitoring them and quite properly carries lasting consequences that simply do not attach from the simple fact of having been born, or going to public school, or riding in a car”); see also Green v. Berge, 354 F.3d 675, 678-79 (7th Cir.2004) (rejecting Fourth Amendment challenge to law requiring DNA samples from felons and contrasting felons from persons not otherwise in custody); id. at 679-81 (Easterbrook, J., concurring) (constitutional challenges to DNA — collection statutes differ depending on the status of the person whose DNA is being collected, and noting that “[t]his appeal does not present the question whether DNA could be collected forcibly from the general population”).
Unlike the cases cited immediately above, however, which concerned parolees, persons on supervised, release, convicted felons, or arrestees, the HCPD had possession of Davis’ DNA because he was the victim of a crime. Thus, the above cases inferentially provide support for Davis’ position, because they all distinguish an arrestee or one convicted of a crime from members ■ of the general public at large.
These cases, however, do not directly answer the question before us, because they involved challenges to the collection of DNA samples, and not, as here, a challenge to the extraction of DNA or retention of a DNA profile when the police already had lawful possession of the DNA sample. And, for the same reason, these cases do not eliminate any consideration of Edwards in circumstances like these. But *246 see United States v. Weikert, 504 F.3d 1, 16-17 (1st Cir.2007) (suggesting that “it may be time to reexamine the proposition that an individual no longer has any expectation of privacy in information seized by the government so long as the government has obtained that information lawfully.... In short, there may be a persuasive argument on different facts that an individual retains an expectation of privacy in the future uses of her DNA profile”).
Nevertheless, we are persuaded by the Supreme Court’s analysis in Skinner, as applied in Mitchell and other cases in the context of DNA, that the extraction of DNA and the creation of a DNA profile result in a sufficiently separate invasion of privacy that such acts must be considered a separate search under the Fourth Amendment even when there is no issue concerning the collection of the DNA sample. See Mitchell, 652 F.3d at 407 (citing United States v. Sczubelek, 402 F.3d 175, 182 (3d Cir.2005) (citing Skinner, 489 U.S. at 616, 109 S.Ct. 1402)).
Based on the foregoing, we conclude that the holding in Edwards does not give a law enforcement agency carte blanche to perform DNA extraction and analysis derived from clothing lawfully obtained from the victim of a crime in' relation to the investigation of other crimes. Instead, a victim retains a privacy interest in his or her DNA material, even if it is lawfully in police custody. Therefore, we conclude that the extraction of Davis’ DNA sample from his clothing and the creation of his DNA profile constituted a search for Fourth Amendment purposes.
We turn to consider whether a separate search occurred when the PGCPD retained Davis’ DNA profile in the local CO-DIS database after the profile did not implicate him in the Neal murder. Our sister circuits do not appear to be uniformly settled on the question whether such entry of a DNA profile into this type of database is a search entitled to Fourth Amendment protection. Compare, e.g., Boroian v. Mueller, 616 F.3d 60, 67-68 (1st Cir.2010) (concluding that the retention and later matching of a lawfully obtained DNA profile is not a search for Fourth Amendment purposes and collecting authority for the same) with United States v. Amerson, 483 F.3d. 73, 85 (2d Cir.2007) (in addition to the collection of the DNA sample from a probationer, determining that “[t]here is ... a second and potentially much more serious invasion of privacy occasioned by the DNA Act” because the “analysis and maintenance of [offenders’] information in CODIS ... is, in itself, a significant intrusion”) (citation omitted) and Kincade, 379 F.3d at 841-42 (en banc) (Gould, J., concurring) (suggesting the retention of a lawfully obtained DNA profile once a person has “fully paid his or her debt to society” and “left the penal system” would implicate the person’s privacy interest).
These differing conclusions illustrate the fact that at least some courts have con-, eluded that once a DNA profile has been lawfully obtained and entered into CODIS, the retention of that profile and “periodic matching of the profile against other profiles in CODIS for the purpose of identification!,]” is not a search because it does not intrude upon an offender’s legitimate expectation of privacy. Boroian, 616 F.3d at 67-68 (so holding and citing other authority for the same).[25] Other courts, at *247 least in principle, have left open the possibility that an unrelated examination after DNA retention could be a separate search for Fourth Amendment purposes. See, e.g., Amerson, 483 F.3d at 85 n. 12.
We need not choose among these competing principles in this case because, as discussed in the next section, we conclude that the extraction and initial testing of Davis’ profile was an unreasonable Fourth Amendment search. Accordingly, for purposes of this opinion, we will assume, without deciding, that Davis had a continuing right of privacy in his DNA profile, and that a search occurred in the retention of that profile. We now turn to consider the issue whether the two searches were reasonable.
3.

Whether the Searches Were Reasonable Under the Fourth Amendment?

As noted above, not every warrantless search violates the Fourth Amendment. Instead, a Fourth Amendment violation occurs when a warrantless search is unreasonable. See Skinner, 489 U.S. at 619, 109 S.Ct. 1402. Courts have employed several different approaches in assessing reasonableness.[26] With regard to searches in which there is an absence of individualized suspicion, the “general Fourth Amendment approach” is to “examine the totality of the circumstances” to determine whether a search is reasonable. Samson v. California, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). Under this approach, the reasonableness of a search “is determined by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.” Id. (citation and internal quotation marks omitted).
For example, in United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Supreme Court applied the totality of the circumstances approach in upholding the search of a probationer’s apartment based on the presence of “reasonable suspicion,” but in the absence of probable cause. Id. at 118, 121, 122 S.Ct. 587. Similarly, in Samson, the Court upheld a suspicionless search of a parolee applying the same approach. 547 U.S. at 846, 126 S.Ct. 2193.
*248 Courts also have applied a “special needs” analysis in certain circumstances to uphold contested searches. See Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); Kincade, 379 F.3d at 823-832 (en banc) (O’Scannlain, J., plurality opinion) (describing development of the special needs doctrine and various Supreme Court cases utilizing it). The special needs doctrine allows warrantless searches “where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement” and “when balancing the individual’s privacy expectations against the government’s interests leads to the determination that it is ‘impractical to require a warrant or some level of individualized suspicion in the particular context.’ ” United States v. Rendon, 607 F.3d 982, 989 (4th Cir.2010) (quoting Von Raab, 489 U.S. at 665-66, 109 S.Ct. 1384) (emphasis in Rendon).
The district court found here that the special needs doctrine was inapplicable, because “the governmental interest in this case cannot be characterized as anything other than an ordinary interest in law enforcement.” Davis, 657 F.Supp.2d at 651. Thus, the district court employed the totality of the circumstances test. Applying that test, the district court found the extraction of Davis’ DNA in conjunction with the Neal murder investigation was “reasonable.” Id. at 654.
On appeal, Davis argues that the totality of the circumstances test is not applicable, because it applies only when a person being searched has “substantially diminished privacy rights.” (Appellant’s Br. 53.) Instead, Davis argues that nothing less than a warrant and probable cause would have allowed the testing and retention of his DNA profile. Davis further argues that, even if the totality of the circumstances test were applicable, the district court applied the test incorrectly. The government also argues that the district court erred in applying the totality of the circumstances test because, in the government’s view, Edwards resolves the issue against Davis.[27]
We begin this part of our analysis by restating our conclusion that the holding in Edwards is not dispositive of the matter under the unique facts before us, and that Davis retained a reasonable expectation of privacy in his DNA profile. We also consider as part of our analysis the fact that Davis’ expectation of privacy may have been diminished to some degree because Davis knew that the police had retained his clothing, yet had taken no action to retrieve his personal effects following his release. Thus, we analyze the reasonableness of the searches here under the “totality of the circumstances test.”[28] Our employment of this test is consistent with the decisions of most of our sister circuits, which have applied the test in cases where there was a diminished expectation of privacy. See Mitchell, 652 F.3d at 403 n. 15 (noting that only the Second and Seventh Circuits have consistently *249 held that the “special needs” test should apply instead of the totality of the circumstances test in addressing the constitutionality of a DNA indexing statute).
Applying the totality of the circumstances test here requires us to “assess[ ], on the one hand, the degree to which [the search] intrudes upon [Davis’] privacy, and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.” Knights, 534 U.S. at 119, 122 S.Ct. 587. When considering the magnitude of the intrusion upon Davis’ privacy, we think it very significant that these DNA searches were conducted in 2004, at a time when Davis was a free citizen and had never been convicted of a felony. The PGCPD extracted Davis’ DNA from his clothing, created Davis’ DNA profile, and checked that profile against evidence on the CODIS database, all while Davis was a free citizen who retained a reasonable privacy interest in his DNA sample and DNA profile, as we have discussed. However, his privacy interest was diminished to a degree by the fact that he knew that the police had retained his bloody clothing, and yet did nothing to retrieve the clothing or otherwise claim ownership in it.
In contrast to many DNA privacy cases, the privacy interest in Davis’ bodily integrity was not implicated when police obtained the DNA sample, because it was taken from his clothing, rather than from his person. This too is a factor that we must consider under the totality of the circumstances. See e.g., Mitchell, 652 F.3d at 404 (weighing the “minimal” intrusion of privacy caused by DNA sample collection by blood test); Jones, 962 F.2d at 307 (weighing “minor intrusion” caused by DNA sample collection by blood test).
We next turn to consider the government’s interest in conducting the search. The police, of course, have a strong and important interest in apprehending and prosecuting those who have committed violent crimes, like the Neal murder and the murder of Schwindler in this case. The government also has a legitimate interest in entering and maintaining information in CODIS and in increasing the number of entries in CODIS to improve its efficacy as a crime-solving tool. See Haskell v. Harris, 669 F.3d 1049, 1062 (9th Cir.2012), reh’g en banc granted, 686 F.3d 1121 (2012) (upholding California law requiring police to collect DNA samples from all adult felony arrestees and citing the government’s four “key interests”: “identifying arrestees, solving past crimes, preventing future crimes, and exonerating the innocent”).
In balancing these competing interests to determine the reasonableness of the searches at issue, we are guided by the weighty reasons underlying the warrant requirement: to allow a detached judicial officer to decide “[w]hen the right of privacy must reasonably yield to the right of search,” and not “a policeman or Government enforcement agent.” Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (quoted in Davis, 657 F.Supp.2d at 653.) The right protected is “a right of personal security against arbitrary intrusions by official power.” Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The importance of the judge or magistrate in the process is why the exceptions to the warrant requirement are “jealously and carefully drawn.” Id.
The potential for arbitrary intrusions of one’s privacy from warrantless searches in cases involving felons, parolees, or arrestees is mitigated by the fact that officials are required to collect from everyone in that certain group of persons. They cannot selectively choose which persons within a particular group must submit a DNA *250 sample. See, e.g., Mitchell, 652 F.3d at 415 (the search is further rendered reasonable because “there is no room for law enforcement officials to exercise (or abuse) discretion by deciding whether or not to collect a DNA sample”); Amerson, 483 F.3d at 82 (“[T]he programmatic nature of the 2004 DNA Act — all felons are required to submit DNA samples, and the uses of those samples are strictly circumscribed— leaves no discretion for law enforcement personnel to decide whether to force an individual to submit to a taking of a DNA sample or how to use the information collected. This lack of discretion removes a significant reason for warrants — to provide a check on the arbitrary use of government power. See, Skinner, 489 U.S. at 621-22, 109 S.Ct. 1402.”).
In this case, by contrast, Davis’ DNA was specifically sought as a result of police suspicions that he was involved in the Neal murder, and based on some quantum of proof amounting to less than probable cause. Indeed, the parties’ briefs and the record before us are devoid of any factual basis for concluding that Davis was involved in the Neal murder. Thus, the precise concern that the warrant requirement was designed to alleviate is plainly before us here. That fact alone severely diminishes the reasonableness of the search. Thus, our comparison of the respective interests leads us to conclude that the government’s extraction of Davis’ DNA sample from his clothing and creation of his DNA profile for testing in the Neal murder investigation constituted unreasonable searches under the Fourth Amendment.
Lastly, we assume, without deciding, that the entry and retention of Davis’ profile into, the CODIS database under these circumstances was also unreasonable under the Fourth Amendment, because the police only had Davis’ DNA profile as a result of a Fourth Amendment violation resulting from the extraction and testing of his DNA profile against the DNA in the Neal investigation.
The conclusion that Fourth Amendment violations occurred does not end our inquiry, however. Instead, as we discuss next, we conclude that the exclusionary rule should not be applied to remedy these violations.[29]
*251 IV.

The “Good Faith” Exception to the Remedy of Suppression

Having determined that there was a Fourth Amendment violation in the extraction and testing of Davis’ DNA profile, and having assumed, but not decided, there was a second violation in the retention of his profile, we address whether suppression is the proper remedy. Leon, 468 U.S. at 906, 104 S.Ct. 3405 (“Whether the exclusionary sanction is appropriately imposed in a particular case ... is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.”) (citation and internal quotation marks omitted). As noted, the district court concluded that suppression was not warranted because the “good faith” exception to the exclusionary rule was'applicable. For the reasons discussed below, we agree.
The Supreme Court articulated the “good faith” exception to the exclusionary rule in Leon, 468 U.S. at 920, 104 S.Ct. 3405. In that case, the Court refused to apply the exclusionary rule where police properly executed a search warrant, but it was later determined the issuing magistrate had erred as the warrant lacked probable cause. Id. at 922, 104 S.Ct. 3405. The Supreme Court has also applied the “good faith” exception to warrantless administrative searches performed in good-faith reliance on a statute later declared unconstitutional, Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), and to an arrest by police who reasonably relied on erroneous information, entered by a court employee into a court database, that an arrest warrant was outstanding, Arizona v. Evans, 514 U.S. 1, 14, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).
The Supreme Court’s recent decisions applying the exception have broadened its application, and lead us to conclude that the Fourth Amendment violations here should not result in the application of the exclusionary rule. See Herring, 555 U.S. at 135, 129 S.Ct. 695; Davis v. United States, — U.S. -, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011).
In both Herring, and Davis, the Supreme Court emphasized the crucial role that deterrence plays in determining whether to apply the exclusionary rule. Specifically, “the benefits of deterrence must outweigh the costs.” Herring, 555 U.S. at 141, 129 S.Ct. 695 (citing Leon, 468 U.S. at 910, 104 S.Ct. 3405 (1984)). That is, courts must weigh the deterrent effect of applying the rule against the cost to society. The “principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free— something that ‘offends basic concepts of the criminal justice system.’ ” Id. at 141, 129 S.Ct. 695 (quoting Leon, 468 U.S. at 908, 104 S.Ct. 3405).
In determining the deterrent effect of applying the rule, the Herring Court explained that the deterrent effect is higher where law enforcement conduct is more culpable. Thus, “ ‘an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus’ of applying the exclusionary rule.” Id. at 143, 129 S.Ct. 695 (quoting Leon, 468 U.S. at 911, 104 S.Ct. 3405).
The Herring Court explained that the rule should not be applied where excluding the evidence would have little deterrent effect on future constitutional violations by law enforcement officers, and the cost to society of such a rule is high. Id. at 147-148, 129 S.Ct. 695 (concluding that “when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal *252 deterrence does not ‘pay its way’ ” and the exclusionary rule should not be applied).
In Herring, the mistake made by police was that a police department in Dale County, Alabama told the neighboring Coffee County police that the defendant had an outstanding arrest warrant in Dale County. Id. at 137-38, 129 S.Ct. 695. In fact, the Dale County arrest warrant had been recalled five months earlier, but had never been deleted from the electronic database. Id. at 138, 129 S.Ct. 695. After being given the incorrect information that the warrant was outstanding, a Coffee County police officer detained Herring, and found drugs and a gun on his person. Id. Herring sought to exclude the evidence seized from his person. Id. at 137, 129 S.Ct. 695.
The majority distinguished the negligent conduct involved in Herring from earlier eases where the good faith exception did not apply, calling the error before it the “result of isolated negligence attenuated from the arrest.” Id. at 137, 129 S.Ct. 695.
More recently, the Supreme Court followed the Herring analysis in Davis, 131 S.Ct. 2419, where the Court considered “whether to apply [the exclusionary rule] when the police conduct a search in compliance with binding precedent that is later overruled.” Id. at 2423. The Court ruled that the exclusionary rule should not be applied in those circumstances, “[b]ecause suppression would do nothing to deter police misconduct ... and because it would come at a high cost to both the truth and the public safety.” Id. In so ruling, the Court again expounded on the balancing test that courts must apply after finding a Fourth Amendment violation: “For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.” Id. at 2427 (citing Herring, 555 U.S. at 141, 129 S.Ct. 695, and Leon, 468 U.S. at 910, 104 S.Ct. 3405). Justice Alito, writing for the Court, elaborated:
The basic insight of the Leon line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way.
Davis, 131 S.Ct. at 2427-28 (internal citations, quotation marks and brackets omitted).
The Davis Court also reviewed the line of “good faith exception” cases, starting with Leon, concluding that “in 27 years of practice under Leon’s good-faith exception, we have ‘never applied’ the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct.” Id. at 2429 (quoting Herring, 555 U.S. at 144, 129 S.Ct. 695.)
Indeed, the Davis Court focused on the issue of culpability as the decisive factor in the case before it:
Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis’ claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield “meaningful]” deterrence, and culpable enough to be “worth the price paid by the justice system.” Herring, 555 U.S. at 144, 129 S.Ct. 695. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis’s Fourth Amendment rights delib *253 erately, recklessly, or with gross negligence. See ibid. Nor does this case involve any “recurring or systemic negligence” on the part of law enforcement. Ibid.
Davis, 131 S.Ct. at 2428.
In order to properly apply Leon, Herring, and Davis here, we must focus on the culpability of the actors who committed the violations. The government mistakenly argues that we should focus on the conduct and “good faith” of PGCPD Detective Blazer, who, based on the cold hit, obtained the warrant for Davis’ known DNA. It is true that nothing in the record suggests that Detective Blazer engaged in any culpable, or even negligent, conduct. He relied in good faith on the cold hit obtained and followed proper procedures in getting a search warrant based on it. There is nothing to suggest that his conduct was improper or that he had any obligation to look behind the cold hit match to see if there was some earlier constitutional violation.
But the deterrent effect of the exclusionary rule must be judged at the point of the constitutional violation, and the culpability of the actors involved then. The pertinent inquiry is whether we apply the exclusionary rule to keep similar violations from happening again; here, to prevent and deter the warrantless extraction of a victim’s DNA from materials lawfully in police custody when he later becomes a suspect and then to deter that DNA profile from being retained. Thus, we look at the culpability of the police officers involved in those decisions, not at Detective Blazer.
As to the first violation, the extraction and testing of Davis’ DNA in connection with the Neal murder, we find nothing in the conduct of the PGCPD officers that would warrant exclusion. As an initial matter, the PGCPD officers had no reason to question that Davis’ blood was lawfully within HCPD custody and indeed, we have concluded that the clothing was properly in police custody.
Although we do not have detailed testimony before us as to the subjective motivations of the PGCPD officers who obtained the clothing and requested it be tested, the unique facts of this case reflect, at most, isolated negligence. What the officers did here was to obtain clothing that was lawfully in police custody and to test it for evidence. Significantly, the only reason they knew of the clothing’s existence was because of Davis’ arrest on drug charges when he left the hospital in Howard County. Had the clothing been obtained initially because of his arrest (like the other items on the property form), Edwards and Wallace v. State, 373 Md. 69, 816 A.2d 883 (2003), a Maryland Court of Appeals decision applying Edwards, likely would have permitted the testing. Thus, attributing culpability to the officers at this stage would be based on either: (1) their failure to learn, or recognize, that the clothing was in police custody because Davis was a victim, rather than an arrestee; or (2) assuming they did know the clothing had been seized from a crime victim, their failure to recognize that Davis’ dual status as victim and arrestee might change the legal analysis set forth in Edwards and Wallace. This is simply not the type of “flagrant,” or “intentional ... patently unconstitutional” conduct that warrants the application of the exclusionary rule. See Herring, 555 U.S. at 143-44, 129 S.Ct. 695. The conduct of PGCPD officers, in testing the blood contained on otherwise lawfully-seized clothing, does not constitute the type of “deliberate, reckless or grossly negligent” conduct that warrants exclusion. See id. at 144, 129 S.Ct. 695. As the Herring Court explained, “[a]n error that arises from nonrecurring and attenuated negligence is thus far re *254 moved from the core concerns that led us to adopt the rule, in the first place.” Id.
The dissent’s mantra of “deliberate and intentional” police conduct at each step in the factual scenarios here, see post at 281, does not alter the facts as we have set them forth or the proper analysis to be applied to them. To be sure, the police took the steps that they did deliberately and intentionally in the sense that their actions were not accidental. But for the reasons we explain, one could insert “innocently” or “without knowledge of any constitutional violation,” before each of those actions.
Likewise, as to any violation that occurred when the analyst entered Davis’ DNA profile into the database after he was not a match in the Neal murder investigation, the record simply does not disclose anything that suggests that this action was anything other than an isolated, negligent incident at best. There is nothing, first of all, to show that the analyst here knew or should have known entering the data would violate the Fourth Amendment. Indeed, the many court decisions (including this Court’s decision in Jones), that have considered challenges to the use of DNA evidence have uniformly upheld statutes and other laws allowing the collection and testing of DNA evidence.
Additionally, while the paperwork accompanying Davis’ clothing indicated that it came from a victim’s clothing (J.A. 164, Supp. J.A. 76), it is not at all clear that the analyst actually knew anything other than that the evidence came from a “suspect in a shooting.” (Supp. J.A. 93.) Similar to Leon and Herring, where officers relied on records from others in law enforcement, the PGCPD officers were relying on the fact that the HCPD had lawfully obtained the evidence. Indeed, while we rejected the government’s broad construction of Edwards based on the fact that Davis was a victim when police seized his clothing, courts have repeatedly held, in broad terms, that evidence lawfully seized by one police agency may be given to another, even for a different purpose and even for additional testing.[30]
So, while we have determined for purposes of this opinion that Edwards did not allow the testing because Davis, as a victim, retained an objectively reasonable expectation of privacy in his DNA, that does not mean that the PGCPD officers and DNA analyst were not acting in a good faith belief that they had authority to do *255 that testing under Edwards and similar cases.
Additionally, there is no evidence before this Court that the retention of a DNA profile in circumstances like that of Davis, is a systemic or recurring problem. The dissent disagrees, relying heavily on what it describes as an “admission” of the government at oral argument that the constitutionally violative conduct here was “clearly systemic.” See post at 279. In our view, that reliance is misplaced. At oral argument, in response to questioning, counsel for the government briefly set forth the basic PGCPD policy or practice that the analyst was following.[31] Specifically, counsel explained that if a piece of evidence was analyzed for DNA evidence and a DNA profile was obtained from it, or if a DNA profile was obtained from a “known sample,” then those DNA profiles were uploaded into the local CODIS database.
From this, our dissenting colleague assumes that evidence tainted by antecedent constitutional violations would also be uploaded to the database. But while it is possible to imagine, given the policy as articulated, that DNA evidence obtained by an illegal search or pursuant to an illegal arrest might end up in CODIS, there is no testimony before us as to whether that actually happened in any other instance. Indeed, defense counsel conceded at oral argument that the evidentiary record before this Court does not contain a single other example of a person’s DNA being placed into the PGCPD local CODIS database without a proper constitutional basis. Any conclusion to that effect is purely speculative.
Moreover, as we have repeatedly made clear, our finding of a constitutional violation in this case was based on the specific and unusual facts of this case. Here, the police properly seized a piece of evidence from a victim in one crime, but then unconstitutionally used DNA evidence extracted from that evidence in investigating an unrelated crime in which the original victim was a suspect. They did so without consent from the victim and without obtaining a warrant, and thus we have found a violation. But a change in any one of those facts might have rendered the inclusion of Davis’ DNA in CODIS constitutionally permissible. For example, had the clothing been taken from Davis as part of an inventory search at the time of his arrest for the present crime, as was the clothing in Edwards, rather than seized from him when he was a victim of a different crime, the result likely would have been different. Similarly, had the police obtained a search warrant to extract Davis’ DNA from his pants and test it in conjunction with the Neal murder, the result likely would have been different.[32] So, the mere fact that other victims’ DNA might be present in the database does not mean there were other constitutional violations.
Likewise, there is no evidence before us that the analyst acted with knowledge that *256 she should not retain the profile.[33] Like the conduct at issue in Herring and in Davis, then, the conduct here stands in stark contrast to the cases in which the exclusionary rule has been applied, described by the Herring Court as “patently unconstitutional” conduct. See Herring, 555 U.S. at 143, 129 S.Ct. 695. Moreover, given the evolving and unsettled law governing DNA searches and seizures (as amplified by the district court’s lengthy decision in this case, the briefs on appeal, and the lack of controlling Fourth Circuit or Supreme Court precedent), the conduct of the officers entering and retaining Davis’ DNA profile can hardly be characterized as brazen or reckless.
We also note that Congress and the Maryland legislature, through their imposition of fines and criminal penalties for failures to comply with their respective DNA statutes, already provide a deterrent effect against similar and future potential misuses of DNA information. Md.Code Ann. Pub. Safety § 2-512 (providing penalties for persons who misuse, disclose, or fail to destroy certain DNA records as required by the Maryland Act); 42 U.S.C. §§ 14135e(c), 14132(c) (same as to federal DNA act). This factor, too, militates in favor of judicial restraint in exercising the remedy of suppression, which exacts a “costly toll upon truth-seeking and law enforcement objectives.” Cf. Herring, 555 U.S. at 141, 129 S.Ct. 695 (citation omitted); see also Osborne, 557 U.S. 52, 129 S.Ct. at 2312 (describing the response of the federal government and the states in regulating DNA testing as “prompt and considered”).
In short, the obtaining and testing of Davis’ DNA from his bloody clothing, and the subsequent inclusion of his DNA profile in the database were, at best, “isolated negligence attenuated from the arrest” [for the Schwindler murder]. See Herring, 555 U.S. at 137, 129 S.Ct. 695. We have no proof before us showing that victims’ DNA profiles or individuals cleared of suspicion in an investigation are routinely entered into the local database by PGCPD, or have been entered into the database in any other instance. There is nothing in the record to suggest that the acts here are likely to reoccur. Moreover, the particularly unusual facts of this case — where a victim, with a dual status as an arrestee, later becomes a suspect in an unrelated crime, and there is DNA evidence available as a result of the crime in which the person was a victim — diminish further the likelihood of reoccurrence. The price to society of application of the exclusionary rule here, especially since the DNA evidence against Davis was compelling, would be to allow a person convicted of a deliberate murder to go free. The deterrent effect, if any, would be minimal, especially considering the lack of culpable conduct on the part of the police. Exclusion, therefore, would not “pay its way.” See Davis, 131 S.Ct. at 2428.[34]
*257 For the foregoing reasons, the good faith exception to the exclusionary rule applies and we affirm the district court’s denial of Davis’ motion to suppress.
V.
Davis’ second and final contention is that the district court erred in excluding the testimony of his proffered expert, Dr. Jeffrey Neuschatz. We review a district court’s evidentiary rulings, including rulings on the admissibility of expert testimony, for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); United States v. Barsanti, 943 F.2d 428, 432 (4th Cir.1991) (decision whether to admit expert testimony “will not be reversed absent a clear abuse of discretion”). We have reviewed the pertinent portions of the record on this issue and find no abuse of discretion with regard to this evidentiary ruling.
At trial, in addition to the DNA evidence and other evidence concerning the offenses, there was one witness, Laverda Jessamy, who identified Davis as being one of the robbers at the scene of the bank robbery and Sehwindler shooting. She had done so both from a photographic array and in person at trial. In response to this identification, Davis sought to introduce the testimony of Dr. Jeffrey Neuschatz as an expert in eyewitness identifications. According to his expert witness report, Dr. Neuschatz intended to testify that the lineup procedure used with Ms. Jessamy did not meet the good practices guidelines of the American Psychology-Law Society and to testify concerning a number of factors which might result in a misidentifieation.
The government moved to exclude this evidence, contending that much of the proffered testimony consisted of common sense factors within the jury’s understanding and not requiring expert testimony. After a hearing, the district court granted the government’s motion to exclude Dr. Neuschatz’s testimony on the grounds that it would not assist the jury. The court also explained that the testimony was not admissible under Fed.R.Evid. 403. In particular, the district court concluded that the probative value of the testimony was low because there was significant other evidence of guilt other than the eyewitness testimony and it was not a case where the government was relying, either exclusively or primarily, on eyewitness testimony. Thus, the danger of unfair prejudice, confusing of the issues or misleading the jury heavily outweighed the probative value of the testimony.
We have reviewed Dr. Neuschatz’s report and his testimony at the Daubert hearing, and find that the district court did not abuse its discretion in concluding that the proffered evidence was not “scientific knowledge” that would be of benefit to the jury. This is consistent with our prior decision in United States v. Harris, 995 F.2d 532 (4th Cir.1993). In Harris, we recognized the “trend in recent years to allow such testimony under [narrow] circumstances,” but nonetheless concluded that “jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness’s testimony can be brought out with skillful cross-examination.” Id. at 534-35.
The district court also did not abuse its discretion when concluding that, even if it qualified as a proper subject of expert testimony, the probative value of the testimony, which was low, was outweighed by the danger of prejudice or confusing the jury. Accordingly, it was not an abuse of discretion to exclude the evidence on Rule 403 grounds.
*258 Finally, we also agree with the government that, even if the testimony was wrongfully excluded, it was at most, harmless error. Most of the points that would have been made by Dr. Neuschatz were made by Davis’ counsel on cross-examination. The compelling DNA evidence against Davis, as well as the evidence of unexplained cash purchases by him and his girlfriend in the days following the robbery were overwhelming evidence of guilt. The detailed jury instruction given by the court, moreover, further recognized and correctly advised the jury as to the legal issues concerning eyewitness identifications. In light of all these factors, we find no abuse of discretion by the district court in excluding the witness.
VI.
For the foregoing reasons, the judgment of the district court is

AFFIRMED.

. Specifically, Davis was convicted of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, two counts of possession and discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), one count of possession and discharge of a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j), and *229 one count of carjacking, in violation of 18 U.S.C. § 2119.

. CODIS is a linked system that allows local, state, and federal forensics laboratories the ability to exchange, share and compare DNA profiles electronically. See United States v. Mitchell, 652 F.3d 387, 399 (3d Cir.2011) (en banc).

. The death penalty was originally sought in this case, but the district court held that Davis was ineligible for the death penalty because he meets the legal definition for mental retardation. That ruling is not challenged on appeal.

. Although the parties and the district court sometimes referred to the two HCPD officers using their titles at the time of the suppression hearing, we use their titles in 2000, as described by them.

. We use the term "DNA material” to refer to any physical body sample that contains deoxyribonucleic acid (DNA) identification information. See 42 U.S.C. § 14135a(c)(2) (defining DNA analysis for purposes of including DNA profiles in CODIS as the "analysis of [DNA] identification information in a bodily sample”).

. The parties are not clear in their briefs and do not point to any record evidence concerning what supported the PGCPD’s suspicion that Davis was involved in the Neal murder. Nonetheless, we presume for purposes of this appeal that, whatever level of suspicion it was, it was insufficient to establish probable cause.

. Davis was initially charged in Prince George’s County Circuit Court and prosecution began there by the Prince George’s County State's Attorney’s Office. That office later dismissed the case against Davis in coordination with the U.S. Attorney’s Office in favor of a federal prosecution. The testimony of the analyst before the Maryland court was attached as Exhibit H to the Government's Consolidated Response to Motions filed before the district court below.

. Although not in evidence, there was a limited discussion at oral argument regarding what the common policy or practice was at that time. See infra at 254-55.

. The accuracy of the DNA match is uncontested on appeal.

. Before the district court, Davis’ counsel argued six different points in which the Fourth Amendment could be implicated. On appeal, he limits his Fourth Amendment challenges to the three recited.

.Relying on United States v. Jackson, 131 F.3d 1105, 1108 (4th Cir.1997), the dissent criticizes the majority opinion for its alleged failure to recognize that the plain view doctrine can justify a seizure, but not a warrant-less search. See generally post at 267-69.
We recognize and acknowledge, as explained in Jackson, that the plain view doc *233 trine is not an exception to the warrant requirement for a Fourth Amendment search. 131 F.3d at 1108. Rather, the proper analysis is that there was a "non-search” here — for Fourth Amendment purposes — because no privacy interests were implicated. That is so because the police were justified in “searching” the bag of Davis' clothing because it was a foregone conclusion that the bag contained evidence of a crime; just as in United States v. Williams, upon which we rely, the police lawfully searched a seized container because it was a foregone conclusion it contained evidence of a crime. 41 F.3d 192, 198 (4th Cir. 1994). We describe the action of the police in either looking in the bag or cataloguing its contents as a "search,” as that term is used in the non-technical sense, since that is the framework utilized by the parties, by the dissent, and by the court in Williams. See id. (“When a container has been legally seized, and its contents are a foregone conclusion, we hold that a subsequent search of the container is lawful under the plain view container doctrine.”). To the extent there is an issue, it is more of labeling than of substance.

. The government also contends that, even if the plain view exception did not apply, the clothing and DNA on it are not subject to exclusion because those items would have been discovered and seized upon Davis' arrest for narcotics violations as he left the hospital. The district court rejected this argument. Davis, 657 F.Supp.2d at 641. In light of our ruling that the plain view exception applies, we do not address the alternative argument of the government.

. The dissent devotes considerable ink to disputing the lawful access prong, complete with hypotheticals unrelated to the situation in the case at bar. See post at 264-67 and corresponding notes. Context matters, however, and the context of this case is that of a police officer who was lawfully fulfilling his duty to investigate a reported shooting. In doing so, he lawfully entered the emergency room of a hospital to interview the victim of the shooting, and. observed both the victim, unclothed from the waist down, lying on a gurney with a visible gunshot wound to his upper thigh, and a plastic bag of clothing underneath the victim's gurney. That context informs our conclusion that the officer had lawful access to the bag.

. While the dissent appears to disagree with the holding of Williams in some respects, see post at 270 n. 13, 275, we are bound to follow our own Circuit’s precedent "absent contrary law from an en banc decision of this Court or a Supreme Court decision.” United States v. Jeffery, 631 F.3d 669, 677 (4th Cir.2011).

. It is unsurprising that neither officer could remember, at the time of their testimony at the suppression hearing in September 2008, precisely what the plastic bag looked like given that they had seen it briefly more than eight years earlier, in August 2000.

. Contrary to the dissent’s unfounded claim that we are engaging in “extraordinary appellate fact-finding,” post at 269 n. 12, we are simply quoting from the undisputed testimony of Officer King in the record. While the government bears the burden of proof to show that the warrantless seizure was justified, the district court ruled in the government's favor and thus any inferences to be drawn from the testimony are to be viewed in the light most favorable to the government. Seidman, 156 F.3d at 547. Moreover, nowhere in its brief does the government "concede” that King did not know it was clothing in the bag. Cf. post at 269 n. 12.

.The dissent's lengthy discussion of United States v. Jamison, 509 F.3d 623 (4th Cir. 2007), see post at 272-73 & n. 15, to suggest that a bullet hole might not have been present in Davis’ pants, is unavailing. Jamison did not involve any challenge to the search or seizure of evidence; the issue there was whether the defendant was in custody for Miranda purposes at the time police questioned him. Moreover, the fact that it was theoretically possible, at the time that Officer King seized the clothing, that Davis was: a) lying about being shot by someone else and *237 had instead shot himself; and b) done so in a manner that somehow avoided putting a hole in his own pants, does not alter our conclusion. As the Tenth Circuit has explained, the knowledge required to establish a “foregone conclusion” is not absolute certainty, but "knowledge approaching certainty.” United States v. Jackson, 381 F.3d 984, 989 n. 2 (10th Cir.2004) (emphasis in original). That standard is met here.

. The Fifth Circuit reasoned in Chavis that “[c]learly, the officer ... would have been derelict in his duty had he not taken custody of Chavis' clothing as evidence of a possible homicide that he was investigating.” 488 F.2d at 1078; see also Jamison, 509 F.3d at 631-32 (in context of addressing interrogation and gun-powder residue testing of a hospital patient who was admitted with a gunshot wound, noting that a reasonable person who is admitted to a hospital with a gunshot wound and reports that he was shot by someone else would expect to be interviewed and “might complain of police malfeasance had [the police] not immediately investigated the shooting[,] [since a] reasonable person would tolerate nothing less than a thorough investigation into such a shooting”).

. The dissent cites Clay v. State, 290 Ga. 822, 725 S.E.2d 260 (2012), as a case in which a court concluded the plain view exception did not warrant the search of a bag of clothing. See post at 274 n. 16. Contrary to the dissent's description of Clay as having "nearly identical" facts, however, the defendant in Clay was an unconscious murder suspect at the time the police reported to the hospital and conducted a search of the bag containing his personal effects. See 725 S.E.2d at 264-65. Significantly, there was no evidence in that case that the police knew there would be blood on his clothing or other evidence of any crime. Unlike Davis, the suspect had not been shot or assaulted and was not being treated for any wounds, nor were any wounds visible, that would indicate there would be blood on his clothing. Id. Under these circumstances, the court concluded that it was not a " 'foregone conclusion’ that the bag contained [the suspect’s] bloody clothes.” Id. at 269. Here, by contrast, there was ample evidence in plain sight (including most notably the gunshot wound on Davis' upper thigh) from which Officer King could conclude it was a foregone conclusion that the bag contained Davis’ clothing, and that the clothing contained evidence of a crime.
Moreover, while Davis and the dissent cite to decisions of other courts for the "unremarkable proposition” that hospital patients retain a reasonable expectation of privacy in their clothing, see post at 274 n. 16, that proposition is far from universally accepted. Indeed, other courts have found that a reasonable expectation of privacy was lacking under facts similar to those here and thus upheld the warrantless seizure and search of clothing belonging to a hospital patient. See, e.g., Mitchell v. State, 321 Ark. 570, 906 S.W.2d 307, 309 (1995) (affirming warrant-less seizure of clothing from hospital and subsequent inventory search, explaining that "[t]he totality of the circumstances herein includes the fact that the appellant was thought to be a victim [and] [t]he clothing of a gunshot victim is evidence of the commission of a crime”); Holt v. United States, 675 A.2d 474, 477, 480 (D.C.1996) (Fourth Amendment was not violated by the search or the subsequent seizure of defendant’s clothing from a “visible, unsealed plastic bag under [defendant’s] gurney in which hospital personnel had stored [his] clothing before treating him” after defendant had admitted himself with a gunshot wound, particularly where he had “voluntarily walked into [the hospital] emergency room wearing — for everyone to see— the clothing the police later inspected” and he never expressed “a desire to remove [the clothing] from public view”); People v. Sutherland, 92 Ill.App.3d 338, 47 Ill.Dec. 954, 415 N.E.2d 1267, 1271 (1980) (gunshot victim whose clothes were removed at the hospital had no reasonable expectation of privacy in those clothes and thus they could be obtained and inspected without a warrant); State v. Adams, 224 NJ.Super. 669, 541 A.2d 262, 265 (N.J.Super.Ct.App.Div.1988) (exigent circumstances permitted the search and inspection of clothing taken from an unconscious hospital patient in the emergency room, who was believed to be the victim of a shooting); Wagner v. Hedrick, 181 W.Va. 482, 383 S.E.2d 286, 291 (1989) (motorcycle accident victim had no “reasonable expectation of privacy in his personal effects” under the control of emergency room staff).

. Indeed, in gauging what is "readily recognizable,” we think it likely that the vast majority of people who have spent time in a hospital (either as a patient or with a friend or family member) know that hospitals commonly place a patient's clothing in a plastic bag that either stays in his room or travels with him on his bed or gurney. On the other hand, most lay people do not have personal experience with the types of packaging used by drug traffickers. Regardless of which container hypothetically is more recognizable in the absence of context and personal experience, we readily conclude that the bag here was readily identifiable as containing Davis' clothing.

. Because DNA is found in many bodily substances, see Kaemmerling v. Lappin, 553 F.3d 669, 682 (D.C.Cir.2008) ("DNA exists in numerous parts of the body that even nonviolent criminals leave behind, including hair, saliva, and skin cells....”) (citation omitted), the mere fact that DNA material is present on a physical item of seized evidence cannot automatically infringe upon a person's privacy *240 interest in his or her DNA. It is not until the DNA is tested and extracted and a DNA profile created that the privacy interest in DNA might be implicated. Put differently, it cannot be the rule that an otherwise lawful seizure of physical evidence becomes illegal merely because a non-perpetrator’s DNA may be on that evidence.

. In Jones, in the context of obtaining DNA profiles from incarcerated felons, we analogized DNA profiling to fingerprinting, i.e., a more sophisticated or refined means of identification. 962 F.2d at 306-07; see also Mitchell, 652 F.3d at 413 ("at present DNA profiling is simply a more precise method of ascertaining identity and is thus akin to fingerprinting, which has long been accepted as part of routine booking procedures”); see also United States v. Amerson, 483 F.3d 73, 85-86 (2d Cir.2007) ("at least in the current state of scientific knowledge, the DNA profile derived from the offender's blood sample establishes only a record of the offender's identity” and "a probationer's expectation of privacy in his or her identity is severely diminished.’’); Boroian v. Mueller, 616 F.3d 60, 66-67 (1st Cir.2010) ("Given the [federal] DNA Act's stringent limitations on the creation and use of DNA profiles, CODIS currently functions much like a traditional fingerprint database” and citing to cases from the Second, Tenth, and District of Columbia Circuits so stating). However, courts also ' have recognized the limitations of this analogy, which stem from the fact that a DNA profile, unlike a fingerprint, is drawn from DNA that stpres a wealth of personal information. See Johnson v. Quander, 440 F.3d 489, 499 (D.C.Cir.2006) ("genetic fingerprints differ somewhat from their metacarpal brethren”); United States v. Kincade, 379 F.3d 813, 841-42 & n. 3 (9th Cir.2004) (en banc) (Gould, J., concurring) ("Like DNA, a fingerprint identifies a person, but unlike DNA, a fingerprint says nothing about the person's health, propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct.”).
In any event, both a thorough examination of the science of DNA profiling, as well as the operation and interplay of local, state, and federal DNA law enforcement databases, are far beyond the scope of this opinion. Other courts have examined these issues in detail and we will not do so here. See, e.g., Mitchell, 652 F.3d at 398-402 (discussing the process of creating a DNA profile for CODIS and the use of “junk” DNA, the federal DNA act and the levels of database that contribute to CODIS); Boroian, 616 F.3d at 63-64, 65-67 *241 (explaining how DNA samples are obtained, summarizing the provisions of the federal DNA act, and describing how CODIS works and how the database has grown and expanded since its initial development).

. The Supreme Court's recent decision in United States v. Jones, - U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) does not change our analysis in this case. In Jones, the Court held that the Fourth Amendment was violated when law enforcement officers, without a valid warrant, installed a GPS tracking device on the undercarriage of the defendant's Jeep while it was parked in a public parking lot. In determining whether this action constituted a "search,” the majority did not reach the issue of whether the Defendant had a "reasonable expectation of privacy” in the under-body of the Jeep. Id. at 950. Instead, its conclusion rested entirely on the fact that the "Government physically occupied private property for the purpose of obtaining information,” id. at 949, and that constituted a violation of the Fourth Amendment right "to be secure against unreasonable searches and seizures in their persons, houses, papers and effects.” Id. In so holding, the Court emphasized that Katz simply established that "property rights are not the sole measure of Fourth Amendment violations,” but that Katz did not extinguish the "previously recognized protection for property.” Id. at 951; see also id. at 954-55 (Sotomayor, J., concurring). In the case at bar, once the police had lawful possession of Davis' clothing, there was no further intrusion of, or trespass upon, his property rights. Thus, the only basis on which the later testing of the clothing could constitute a search is if Davis retained a reasonable expec- ' tation of privacy in his clothing or the blood on it.

. The government also, relies on United States v. Gargotto, 476 F.2d 1009 (6th Cir. 1973) and Wallace v. State, 373 Md. 69, 816 A.2d 883 (2003). In Gargotto, the Sixth Circuit held that a defendant’s records seized in a state investigation could be given to federal authorities without a separate search warrant, and used as evidence in an unrelated federal case. 476 F.2d at 1014. Similarly, Wallace affirmed the warrantless search and visual inspection of the defendant’s clothing in conjunction with a murder charge, where the clothing had been initially seized during an inventory search upon his arrest for drug charges, because the defendant had no reasonable expectation of privacy in that clothing. 816 A.2d at 897, 901. The district court considered Wallace and other similar cases, but found them all distinguishable on the grounds that the evidence in the other cases lawfully entered police custody pursuant to a defendant’s arrest or was seized pursuant to a warrant supported by probable cause. Davis, 657 F.Supp.2d at 646. By contrast, Davis’ pants with the bloodstain were in lawful police custody as evidence of a crime in which he was the reported victim. Id. at 647.

. The Boroian court relies on Amerson as a case supporting this principle. 616 F.3d at 68. However, a careful reading of Amerson reflects that the Second Circuit found a reasonable expectation of privacy in the retention of a DNA profile in CODIS,.and periodic matching of the profile, see 483 F.3d at 85 n. 12, 86, but ultimately concluded that the *247 search was justified under the special needs test. Id. at 86-87 (upholding the federal DNA Act against Fourth Amendment challenges and "acknowledging] that the DNA profile of appellants will be stored in CODIS, and potentially used to identify them, long after their status as probationers — and the reduced expectation of privacy that such a status involves — has ended,” but concluding that fact did not "change[] the ultimate analysis.”)

. Even in cases where a person is subject to some type of criminal charge or restraint, there are varying viewpoints regarding the proper approach and its application. In the Ninth Circuit's Kincade case, which was heard en banc, a five-member plurality voted to uphold the federal DNA Act against a Fourth Amendment challenge and employed a totality of the circumstances test. 379 F.3d at 832 (en banc) (O’Scannlain, J., plurality opinion). Judge Gould, concurring in the result, voted to uphold the Act, but would have applied the "special needs” analysis. Id. at 840 (Gould, J., concurring). Five dissenting judges would have found a Fourth Amendment violation, but would have employed different approaches. See id. at 842-76 (dissenting opinions); see also id. at 830-31 (O'Scannlain, J., plurality opinion) (collecting authority and comparing cases which have applied a special needs test in the context of DNA profile collection and cases which have applied a “totality of the circumstances” balancing test); Mitchell, 652 F.3d at 403 n. 15 (noting that only the Second and Seventh Circuits have consistently held that the special needs test should apply in addressing the constitutionality of a DNA indexing statute and concluding that the totality of the circumstances is the proper test).

. In an alternative argument as to why the retention of Davis’ DNA profile does not constitute a separate search, the government contends that once the district court had determined there was no Fourth Amendment violation in the extraction and testing of Davis’ DNA from his clothing as part of the Neal investigation, Davis no longer had any expectation of privacy in the DNA profile. (Appellee’s Br. at 50-51 (citing Johnson v. Quander, 440 F.3d 489, 498-99 (D.C.Cir.2006) and state court opinions).)

. Neither party argues for the application of the "special needs” test here. We also conclude it should not apply here because it applies in contexts "beyond the normal need for law enforcement,” Rendon, 607 F.3d at 989, and only normal law enforcement interests are involved here.

. Subsequent to briefing and argument in this case, the Maryland Court of Appeals upheld an as-applied constitutional challenge to a portion of the Maryland DNA Collection Act (enacted several years after the events in the case at bar) that authorizes the warrantless collection and uploading of certain arrestees' DNA into the Maryland DNA database. See King v. State, 425 Md. 550, 42 A.3d 549 (2012). (The mandate in King, however, has been stayed pending the Supreme Court’s ruling on the state’s petition for certiorari. See, Maryland v. King, - U.S. -, - S.Ct. -, - L.Ed.2d -, 2012 WL 3064878 (July 30, 2012)). The King court, as we have, utilized a "totality of the circumstances” test to determine whether the search at issue was reasonable.
We note, however, that the ultimate conclusion of the King Court does not alter our analysis. First, the case is factually distinguishable. Not only did it involve a portion of Maryland’s DNA statute not in effect at the time of events in the case at bar, but it involved the taking of a DNA swab from an arrestee, rather than the creation of a DNA profile from a victim's DNA sample already lawfully in police possession. Second — and significantly — the King Court did not address at all the application of the good faith exception, nor is there any indication in the opinion that it was asked to do so.
Since the question is not before us, we express no opinion on the King Court's conclusion, although we note that it is contrary to decisions by the Third and Ninth Circuits. See, e.g., supra at 245-46, 249-50 (citing Haskell v. Harris, 669 F.3d 1049, 1062 (9th Cir. 2012), reh’g en banc granted, 686 F.3d 1121 (2012) and United States v. Mitchell, 652 F.3d 387, 407 (3d Cir.2011) (en banc), both of which upheld statutes requiring the collection of DNA from arrestees).

. See, e.g., Wallace, 816 A.2d at 896-97 (collecting cases); Williams v. Commonwealth, 259 Va. 377, 527 S.E.2d 131, 136 (2000) (holding that defendant had no expectation of privacy in boots that were seized incident to his arrest and thus that "later examination of the property by another law enforcement official [with a different department] does not violate the Fourth Amendment”, even if being examined for a different charge than the charge for which he was arrested); United States v. Turner, 28 F.3d 981, 983 (9th Cir. 1994) (removal of defendant’s cap from jail by postal inspector without a warrant was proper since it remained in the possession of the police); United States v. Thompson, 837 F.2d 673, 674 (5th Cir.1988) ("A person lawfully arrested has no reasonable expectation of privacy with respect to property properly taken from his person for inventory by the police. Later examination of that property by another law-enforcement officer is, therefore, not an unreasonable search within the meaning of the Fourth Amendment.”); United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir.1987) (money seized by state authorities upon defendant’s arrest for driving under the influence could be later reviewed by a federal agent to obtain serial numbers in a robbery investigation without a warrant); United States v. Jenkins, 496 F.2d 57 (2d Cir.1974) (relying on Edwards to conclude there was no Fourth Amendment violation where a federal agent took "second look” and seized without a warrant money that had been taken from the defendant following his arrest on unrelated state charges and maintained in the jail safe).

. Counsel prefaced her comments by referencing the policy at the time Davis’ profile was uploaded. The record does not disclose whether that policy has changed in light of subsequent developments in the Maryland or federal DNA laws, or as a result of decisions like the district court’s decision in the instant case, issued in 2009.

. Because those are not the facts before us, we need not resolve the constitutionality of the DNA searches in those hypothetical cases. But those slight differences in fact might well alter our conclusions regarding the constitutionality of the police actions and the uploading of DNA profiles. Thus, the mere existence of the policy stated by counsel does not necessarily mean that the violation here was anything other than isolated.

. While the analyst testified that she knew the state level database required deletion of a profile once a court had exonerated a person previously convicted, there is nothing in the record to support that she knew the profile of either a victim or a suspect was required to be destroyed in the circumstances here, nor has Davis pointed to any statute with such a requirement.

. Contrary to the dissent’s contention, we are not creating a "new, freestanding exception” to the exclusionary rule. Post at 278. Rather, we have faithfully applied the Supreme Court’s precedent, including its recent application of Leon in Hemng and Davis. While the dissent refers to the "narrow holding[s]” in those cases, and deems inapplicable the "broad cost-benefit analysis” that underlies those holdings, post at 278, 280, the Supreme Court’s analysis in those cases is not dicta, but is the rationale supporting the Court’s application of the good-faith exclusion.